BOWEN, Presiding Judge.
The defendant was indicted and convicted for the murder of his neighbor, Oliver Anderson, Jr., in violation of Section 13A-6-2, Code of Alabama 1975. Sentence was life imprisonment. The sole issue raised on appeal is whether the defendant’s motion for new trial was due to be granted on the ground that the evidence of insanity was overwhelming.
Mrs. Wilma Anderson, wife of the victim, testified that when she came home from work on June 3, 1980, her husband went out into the backyard. She heard two shots, ran out the back door, and found her husband lying dead in the garden.
Mr. Eugene Edwards, who lived in the same neighborhood as the victim and the defendant, stated that he was out in the yard playing dominoes when he saw the defendant walk outside with a pistol in his hand. The defendant shot twice into the ground and said, “I will shoot anybody. I . have got a right to do what I am doing.” He then walked over to the victim, fired twice, re-holstered his pistol and went back inside.
On cross examination, Edwards testified that he had known the defendant since he moved into the neighborhood and he had never noticed any “strange behavior” on the defendant’s part, or seen the defendant “bother” anyone.
Mr. Johnny Ruffin was watching the domino game when he heard a shot and turned to look. He saw the defendant fire *908 two shots at the victim and then start mumbling to himself. On cross examination he said that the men in the domino game had been talking about the fact that defendant claimed to be “with the FBI or something.”
Officer Ross Spurlock of the Birmingham Police Department arrived on the scene shortly after the shooting and ordered the defendant to “freeze”, whereupon the defendant dropped his gun, made no attempt to escape, and surrendered to the police. Spurlock said that the defendant appeared to know where and who he was and appeared to recognize the officer as a policeman.
Birmingham Police Sergeant James E. Gay interviewed the defendant after his arrest and took a statement from him at the police station. Gay testified that the defendant appeared to comprehend the questions he was asked, claimed to understand his constitutional rights, and seemed to know the difference between telling the truth and telling a lie, insisting that he was going to tell the truth. According to the officer, the defendant understood where and who he was, knew that Sergeant Gay was a police officer, and answered his questions in a forthright manner.
On cross examination, Gay conceded that some of the defendant’s answers were “rambling” but concluded that he “didn’t notice anything unusual from most of the people that (he) interview(ed) ... it was just a normal interview (like he had) conducted many, many times.”
After the State rested, the defense read > into evidence the deposition of Dr. James C. Thompson, staff psychiatrist at Bryce Hospital, who stated that the defendant had been hospitalized in Bryce for approximately one year, from February 1981 to February of 1982. Based on three interviews, the results of psychological tests, and the defendant’s social history, Thompson concluded that the accused was suffering from “schizophrenia, paranoid type.” The psychiatrist explained that the defendant had “pretty fixed delusions ... that people are against him ... specifically in this case, it was .,. a neighbor or neighbors.” Dr. Thompson stated that the anti-psychotic medication Haldol had been prescribed for the defendant.
When asked his opinion of the defendant’s mental condition at the time of the incident in question, the physician responded as follows:
“A. It would be hard to say exactly, but from what history we have and the fact that I didn’t see him originally — but we felt like that the act of which he was charged, he was acting under a delusion at that time.
“Q. That he was acting under a delusion?
“A. That his neighbor, I believe, was out to get him.
“Q. So would it be your opinion that he was mentally incapable of forming an opinion as to whether or not his actions were right or wrong?
“A. Yes.”
On cross examination, Thompson stated that each of his three interviews with the defendant lasted fifteen minutes and the first session took place fifteen months after the shooting. Dr. Thompson conceded that “the longer it has been from the time of an incident until you interview somebody, the harder it is to look back and see what their mental state was at the time of an incident.” He also admitted that not everyone suffering from a mental disease or defect is unable to appreciate his criminal acts or to conform his conduct to the requirements of the law.
The defense then called Mrs. Nellie Scott, the defendant’s sister, to testify to the defendant’s history of mental problems. She stated that her brother was first hospitalized in the Veterans Administration facility following a series of hallucinations in 1961, but that his aberrant behavior began in 1945 after he was discharged from the service. Mrs. Scott said that after several months her brother was released from the VA Hospital on the medication Thorazine. She returned him to the hospital over the years for further medication whenever he *909 hallucinated or thought people were “after him”. She testified that since 1961 her brother’s mental condition had fluctuated depending upon whether he took the medicine. As long as he had his medication he was, according to his sister, in “pretty good shape.”
During June 1980, Mrs. Scott noticed that her brother’s mental condition began to deteriorate and she found that he did not have his medicine. She stated that during this period he had conversations with people who were not there, took notes in little books, carried a badge, and made calls to the FBI.
Mrs. Lorene Woodruff, another of the defendant’s sisters, corroborated Mrs. Scott’s testimony regarding her brother’s history of mental problems. She testified that she had been appointed the defendant’s guardian for receipt of Social Security benefits.
Ms. Donna Click, a psychiatric social worker, testified that she was employed by Jefferson County to evaluate “alleged mental patients” incarcerated in the jail. At the request of Judge Stewart and Sergeant Gay, she interviewed the defendant and determined that he was in need of further psychiatric testing., Ms. Click read the notebooks kept by the defendant and described the entries as “very bizarre”. She also testified that the defendant told her he was employed by the FBI or the CIA.
The defense rested and the State presented no rebuttal evidence.
The legal principles governing the burden and sufficiency of proof of insanity are collected in Cunningham v. State, 426 So.2d 484 (Ala.Cr.App.1982), and need not be restated here. See also Alvis v. State, (1983) 434 So.2d 859 (Ala.Cr.App.1983). In Lewis v. State, 439 So.2d 1357 (Ala.Cr.App.1983), the accused had also been diagnosed as a paranoid schizophrenic. There, we held that the refusal of the affirmative charge was not error.
“Even if the jury accepted the testimony of the experts, there remains the fact that no expert testified that Lewis was suffering from a mental disease or defect at the time of the crime. Here, there was simply no showing that Lewis lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law at the time of the criminal conduct.
Alabama Code Section 13A-3-1 (1975). Lewis’ own expert testified that he would have periods of remission and recovery.
“ ‘There is no presumption that fitful and exceptional attacks of insanity are continuous — a proposition manifest in itself. It is only insanity of a chronic or permanent nature which, on being proved, is presumed to continue.— Whart.Cr.Ev. Section 730. The rule, therefore, prevails that where an insane person “has lucid intervals, the law presumes the offense of such person to have been committed in a lucid interval, unless it appears to have been committed in the time of his distemper.” — 1 Russell on Cr. 11; 1 Hale, 33-4.’ Ford v. State, 71 Ala. 385, 395 (1882).
“See also Cogbill v. State, 8 Ala.App. 223, 227, 62 So. 406 (1913).”
“A defendant does not, by evidence that he was ‘subject to spells of insanity from time to time’, raise a presumption that he was insane when he committed the homicide so as to shift the burden of proving his sanity to the State. Talbert v. State, 140 Ala. 96, 37 So. 78 (1904).” Carey v. State, 361 So.2d 1176, 1178 (Ala.Cr.App.1978).
Evidence of commitments to hospitals for mental and psychological reasons is insufficient, in and of itself, to establish that the accused was legally insane at the time the crime was committed. Evans v. State, 410 So.2d 143 (Ala.Cr.App.1981). “Unusual or weird behavior alone cannot be equated with mental insanity.” Meredith v. State, 370 So.2d 1075, 1078 (Ala.Cr.App.), cert. denied, 370 So.2d 1079 (Ala.1979).
The fact that the defendant could have been insane at the time of the crime does not authorize this Court to reverse the *910 jury’s finding to the contrary. Smith v. State, 32 Ala.App. 209, 211, 23 So.2d 615 (1945). The fact that this Court may not agree with the verdict of the jury “does not warrant a reversal of a cause in which a jury, exercising their solemn prerogative to determine the issues, has rendered a verdict which is supported by substantial evidence, and which verdict cannot rationally be said to be arbitrary.” Cunningham, 426 So.2d at 491, quoting Fitzhugh v. State, 35 Ala.App. 18, 26, 43 So.2d 831 (1950).
Here, there was substantial evidence from which the jury could have found that the defendant was insane. However, that evidence was not so overwhelming and conclusive that they were compelled to so find. For this reason, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.