Appellant, Woodrow Westbrooks, was convicted of murder by a Jefferson Circuit Court jury. He was sentenced to twenty years' imprisonment.
The facts in the case pertinent to this appeal are as follows:
On August 1, 1980, Lynn Jones passed the apartment of a neighbor, Freeman Denton. She was able to see through a door into the apartment kitchen, where she observed Denton and another neighbor, Woodrow Westbrooks, seated at a table arguing. Ms. Jones was unable to hear what was being said, but she saw Westbrooks pick up a butcher knife and shake it at Denton. Although there is some conflict in the evidence, Ms. Jones apparently then went to her apartment to summon her husband to accompany her back to Denton's apartment. The two arrived in time to see Westbrooks rise from the table and bend over Denton with the knife. When Westbrooks began to attack Denton, Jones told his wife to call the police. Appellant repeatedly stabbed his victim. When Denton stopped moving, Westbrooks told Jones to call the police. Both Mr. and Mrs. Jones testified that there were containers of alcoholic beverages on the table at which the two men had been seated.
 I
The first issue raised on appeal is whether or not the evidence adduced at trial sustained the jury's verdict. Specifically, appellant claims that the jury disregarded "undisputed testimony" that, at the time of the offense, he was legally insane.
The law is clear that a defendant is presumed to be sane; insanity is an affirmative defense, with the burden of proof resting at all times with the defendant. Cunningham v. State,426 So.2d 484 (Ala.Cr.App. 1982). Great weight must be given to the jury's verdict, and a decision to reject the insanity defense will only be overturned where "`the proof of insanity is overwhelming and undisputed,' Graham v. State,383 So.2d 892, 895 (Ala.Cr.App.), cert. denied, 383 So.2d 895 (Ala. 1980)," as quoted in Cunningham, supra.
There was evidence that appellant did suffer from a mental abnormality. Westbrook's sister testified that appellant had been a heavy drinker since 1943. She testified that her brother suffered from alcoholic blackouts during which he said and did things which he was later unable to recall.
Psychiatrist John Callahan examined Westbrooks approximately seven months after the stabbing to determine his competency to stand trial. At that time, he formed the opinion that appellant had some type of organic brain syndrome, possibly secondary to alcoholism, and that he might be psychotic. Callahan recommended that Westbrooks receive further evaluation at Bryce Hospital.
Clinical psychologist Edwin Segar was a member of the forensic team that evaluated Westbrooks at Bryce Hospital over a year after Denton was killed. The team ultimately concluded that appellant suffered from alcoholic abuse and an amnesic disorder. *Page 1025 
Other expert evidence at trial supported the diagnosis that appellant had organic brain syndrome and alcohol dependence.
Despite considerable evidence that appellant was suffering from a mental disorder, "Expert testimony is not conclusive on the jury and it may be rejected. . . ." Cunningham, supra. Even where it is shown that an individual is subject to spells of insanity, the law presumes that the crime he committed occurred during a lucid interval. Turner v. State, 455 So.2d 907
(Ala.Cr.App. 1983). It is our duty to determine whether or not the case at bar is one of those exceptional cases where the evidence concerning appellant's mental state at the time of the crime points to only one conclusion. In making this determination, we must consider that "the fact that the defendant could have been insane at the time of the crime does not authorize this court to reverse the jury's findings to the contrary." Turner, supra. (Emphasis added.) The evidence presented in support of Westbrook's plea of insanity was not so overwhelming and conclusive that the jury were compelled to so find.
Here, there was a substantial amount of evidence from which the jury could have reasonably concluded that Westbrooks was sane at the time he stabbed his victim.
Police Officer Selman Morgan Knight interviewed the appellant only a few hours after the incident. Although the officer testified that Westbrooks appeared to be drunk, the suspect had no trouble conversing about the occurrence and did not seem confused. Westbrooks was coherent and Officer Knight opined that the statement he gave was voluntary and not the result of intoxication. Certainly, the description Officer Knight gave of Westbrooks was of a man who could be sane enough to form the specific intent to murder. Ala. Code § 13A-6-2 (a)(1) (1975).
In addition, the eyewitness testimony regarding the killing also supported the jury's conclusion that appellant was responsible for his actions. The two men were embroiled in a heated argument when Westbrooks stabbed the victim. Mr. Jones testified that appellant appeared to know what he was doing. Also, Westbrooks's request that Jones call the police after the stabbing was evidence that he was cognizant of what he had done.
Further, portions of the testimony given by the defense medical witnesses could have been used by the jury to support their determination.
Psychologist Edwin Segar testified about the problem the Bryce staff had in coming to a consensus about Westbrooks's mental state. In Segar's words ". . . it was difficult for us to come to a conclusion . . . [about] whether or not he was just faking this because he knew he was in a heap of trouble, and he was looking for some kind of defense or whether or not it was an authentic type of memory problem."
The following portions of the transcript of Segar's testimony are also revealing:
 "Q. Didn't you just tell me out on the hall this morning that you really couldn't tell whether or not he was suffering from one of them [a blackout] on August 1, 1980?
 "A. What we talked about was the degree of responsibility — now he may have been suffering from alcohol blackout; whether or not that — that made him totally irresponsible for his actions at that time — I couldn't say.
 "Q. Was his blackout of such a nature that he could not tell the difference between right and wrong? . . . In your opinion?
 "A. His blackout diminished his responsibility to what degree it's up to the jury to decide.
 "Q. Well, I'm asking your opinion — you are a psychologist?
 "A. I think it diminished his responsibility — I can't tell you how much.
 "Q. You don't know then whether or not it diminished his responsibility to such a nature that he could not tell the difference between right and wrong, is that your testimony? *Page 1026 
"A. Yes, sir.
 "Q. Or that further — you don't know whether or not he suffered such an extent that he could not — that he lacked the substantial capacity to appreciate the criminality of his conduct — you can't tell us that, can you — as to whether or not his disease was such a nature that he could not conform his conduct to the requirements of law?
"A. No, I cannot.
 "Q. Would you say that the disease, alcoholic blackout, that mental disorder, excuse me, you say it is one of the hardest to determine, whether or not it does or does not exist?
"A. Yes, sir."
Although the deposition given by Bryce staff psychiatrist James Thompson indicated that appellant may have been suffering from a mental blackout at the time of the crime, his testimony also established that there was some ambiguity on that point. When asked if the amount of alcohol Westbrooks consumed on the evening of the stabbing could have triggered an amnesic blackout, the doctor replied "It's hard to say. I think it's possible." In response to a direct inquiry as to whether or not he could say appellant was suffering from a blackout on August 1, 1980, the psychiatrist said "You can only presume. I think he — according to his history, there is a good possibility that he may have, but you really don't know."
We conclude, after careful consideration of the record, that there was sufficient conflicting evidence to submit the issue of appellant's sanity at the time of the crime to the jury.
 II
The last issue raised by appellant is whether or not the trial court erred in overruling his motions for judgment of acquittal and for a new trial. These motions were made after the conviction when appellant's counsel states he discovered that the interview between Police Officer Knight and Woodrow Westbrooks on the night of the killing had been tape recorded. At trial, the police officer denied that the statement had been recorded. Appellant claims that the recording was a crucial piece of evidence. He argues that since the tape shows that he was drunk at the time he was questioned, the jury should have had access to it.
We must agree with the State that the evidence supplied by the tape would have been merely cumulative and probably would not have changed the result had a new trial been granted; thus, we find no error was committed by the lower court. (See Ala. Digest, Criminal Law, Key No. 938 (1) and cases cited therein.)
We conclude that the judgment in this case should be affirmed.
AFFIRMED.
All the Judges concur.