Brenda Ann Dixon, the appellant, was convicted of the attempted murder of Tuscaloosa police officer Tina Williams and was sentenced to 20 years' imprisonment. On this direct appeal of her conviction, the appellant raises five issues. However, our disposition of the first issue makes discussion of the remaining four unnecessary. *Page 66 
The appellant claims that the evidence of her insanity was overwhelming, overcame the presumption of sanity, and entitled her to a judgment of acquittal. We agree.
At the time of the events at issue here, the appellant was a 40-year-old attorney practicing law in Tuscaloosa. About 9:30 p.m. on Sunday, August 4, 1991, Tuscaloosa police officers Wilson and Braughton encountered the appellant "walking down the median of McFarland Boulevard saying she was being followed." R. 172. Sgt. Wilson testified that the appellant "appeared to be very paranoid, thinking somebody was after her." R. 173. The appellant told the officers that she "didn't think [they] were police officers," even though they were in uniform, because they "could have bought the uniforms." R. 173.
At approximately 10:30 that same night, the appellant walked into a Bruno's grocery store on McFarland Boulevard and asked the manager, Sidney Cannon, where the matches were. The appellant handed Cannon a note saying she was being followed. Cannon testified that the appellant looked "spaced out" and was "acting very strange." R. 91. The appellant asked Cannon to call the state troopers to help her; she specifically asked him not to contact the Tuscaloosa police. Cannon telephoned the state troopers, but they recommended that he call the Tuscaloosa police. When the appellant heard Cannon calling the Tuscaloosa police, she left the store and crossed the street to Snow Hinton Park. Mr. Cannon said that he thought it was "odd" that a woman who said she was being followed would leave the store and proceed into the park alone at night. R. 90.
A dispatch was broadcast over the police radio that Bruno's had an "[u]nwanted guest acting crazy." R. 100. In response, Tuscaloosa police officer Tina Williams arrived at the Bruno's store about 11:00 p.m. After talking with Mr. Cannon and being shown the appellant's note, Officer Williams went to Snow Hinton Park to "locate [the appellant] and give her any assistance she needed or take her home." R. 101.
When Officer Williams reached the park, she saw a light through some trees. As she neared the trees, she saw a figure silhouetted against the glow and she realized the light was a fire. Officer Williams called out, "Do you need a police officer?" and radioed for a police unit with a fire extinguisher. R. 103. At that moment, the appellant jumped out from behind the trees, made a "karate kick sound," and charged at Officer Williams. R. 105. The officer called in "Bravo 67 00 (officer needs all possible assistance)" on her radio. R. 105. The appellant kicked the radio out of Williams' hands and knocked the officer down, and the two began to wrestle. R. 106. The appellant kicked, scratched, and bit Officer Williams. Then the appellant managed to pull the officer's revolver from its holster and said, "I've got you now, Bitch." R. 109. As the appellant pointed the revolver at the officer's chest, Officer Williams deflected the gun away from her body and the weapon discharged.
Several police officers responded to Officer Williams' call for assistance. They subdued the appellant and took her into custody, and arranged for Officer Williams to be transported to a local hospital. Officer Williams was treated for a scalp injury and was released.
On August 5, 1991, the day after the incident, the appellant was evaluated on an outpatient basis at Taylor Hardin Secure Medical Facility. On August 7, the Tuscaloosa County District Attorney's Office and the appellant's defense counsel jointly moved for an order, pursuant to Rule 11.2(d), A.R.Crim.P., mandating inpatient treatment and evaluation of the appellant to determine her competency to stand trial. That same day, the appellant was committed to Bryce Hospital for an evaluation and was diagnosed as suffering from "delusional disorder, persecutory type." The medications Vistaril and Haldol were prescribed. C.R. 305. Following a hearing on August 30, the circuit court found
 "by clear, unequivocal and convincing evidence that the defendant, Brenda Dixon, is presently incompetent to stand trial and provide reasonable assistance with rational understanding to her counsel and defense, as a result of a mental disease. The Court further finds, however, that there is a substantial probability that the defendant will *Page 67 
be restored to competency within a reasonable period of time.
 "The Court further finds, upon the testimony of the experts, as well as evidence presented of a recent overt act, that the defendant's being at large poses a real and present threat of substantial harm to herself or others." C.R. 128.
On August 30, the appellant was committed, pursuant to Rule 11.6(c)(3)(i), A.R.Crim.P., to Searcy Hospital for treatment. Stelazine was prescribed as part of her treatment. On September 17, the mental health professionals at Searcy determined that the appellant had responded well to medication, was competent to stand trial, no longer presented a danger to herself or to others, and should be released. As a condition of her pre-trial release on bond, the circuit court ordered the appellant to attend bi-monthly psychotherapy sessions at Indian Rivers Community Mental Health Center in Tuscaloosa. From September 24, 1991, until July 6, 1992, the appellant was in psychotherapy with clinical psychologist Dr. Jerry L. Hart.
The appellant was indicted on March 2, 1992. On July 24, 1992, she entered pleas of not guilty and not guilty by reason of mental disease or defect. On March 22, 1993, the circuit court ordered Dr. Wilburn H. Rivenbark, chief psychologist and certified forensic examiner at Taylor Hardin Secure Medical Facility and the psychologist who had first examined the appellant on the day after the incident giving rise to this prosecution, to conduct a "state of mind at the time of the incident evaluation" of the appellant. Dr. Rivenbark was asked to determine whether the appellant "at the time of the commission of the acts constituting the offense (charged in this Indictment) as a result of severe mental disease or defect, was unable to appreciate the nature and quality of the wrongfulness of her acts." C.R. 186. The appellant was tried on the instant charges on April 20-22, 1993.
At trial, the State presented the testimony of five witnesses: Sidney Cannon, manager of the Bruno's store; Officer Williams, who was injured in the struggle with the appellant; Tuscaloosa police Sgt. Michael Wilson, who had encountered the appellant earlier in the evening walking along McFarland Boulevard and who later came to Officer Williams' assistance in Snow Hinton Park; Stephen Wheat, another Tuscaloosa police officer who came to Officer Williams' aid in the park; and Mary Jackson, an emergency room technician at Druid City Hospital, who described Officer Williams's injuries.
The defense presented the testimony of three witnesses: Dr. Rivenbark; Lee Keene, a close friend of the appellant's; and Hank Hawkins, a Tuscaloosa attorney.
Dr. Rivenbark gave his opinion that the appellant was suffering from a psychotic delusional disorder at the time of the incident on which the indictment was based. R. 234. He testified that "the [appellant's] thought processes were severely impaired by her delusional disorder to the extent that she was unable to rationally evaluate and appreciate either her own actions or those of others" at the time of the alleged offense. R. 235. He concluded that "as a result of a severe mental disease or defect [the appellant] was unable to appreciate the nature and quality of the wrongfulness of her acts." R. 249.
Dr. Rivenbark testified that the appellant reported taking Valium and diet pills on August 4, 1991. His initial impression of her mental status when he examined her the next day, and based on the history she reported, was "delusional disorder or drug-induced psychosis." R. 239. Rivenbark stated that he deleted "drug-induced psychosis" from his final diagnosis for two reasons. R. 235. First, while explaining that "[m]ost drugs if taken in heavy enough quantities [for a] long [period] can produce some organic mental disorder," R. 223, he concluded that the appellant's drug consumption was not great enough to produce an organic mental disorder. After his initial diagnosis, Rivenbark received the results of a drug screen performed on the appellant on August 9. The fact that the drug screen was negative led Rivenbark to conclude that the appellant had not taken enough Valium or diet pills to have precipitated her behavior on August 4. R. 235, 238. Next, and more significant to Dr. Rivenbark, was the fact that the appellant was still displaying psychotic, delusional symptoms long after any drugs, even if she *Page 68 
had taken them in great enough quantities to have caused a psychosis, were out of her system. R. 235.
Dr. Rivenbark testified that in formulating a diagnosis, he examined statements by Officer Williams and witnesses to the incident. He also reviewed the appellant's records from Bryce and Searcy Hospitals and Indian Rivers Community Mental Health Center, as well as information from Tuscaloosa psychologist Dr. Jerry Hart, who had treated the appellant while she was awaiting trial. The records from Bryce included the results of psychological tests, a social and family history, "a CT scan" of the brain, and a drug screen. R. 238. The psychiatric team at Bryce had characterized the appellant's condition as "delusional disorder, persecutory type." R. 239. The records from Searcy Hospital showed that Dr. Ronald C. Bloodworth, a staff psychiatrist, had initially diagnosed the appellant as suffering from a "delusional disorder," and had later changed the diagnosis to a "psychotic disorder, not otherwise specified" with paranoid features. R. 241. Dr. Sheldon L. Rosenzweig of Indian Rivers Community Mental Health Center also performed a mental status evaluation of the appellant. He concluded that she had "an underlying mental disorder which may have been exacerbated . . . by substance abuse," but concluded further "that the disorder was there." R. 242.
Dr. Rivenbark testified that the appellant gave the following account of her encounter with Officer Williams:
 "[The appellant] had set fire to a tree trying to attract attention to get a crowd of people around her so that she could find someone she could feel safe and comfortable with. . . . [S]he then saw a person coming to her dressed in a police officer's uniform. [The appellant's] statement was she did not believe this person was a police officer and that if she was, she was not there to carry out a lawful arrest or whatever but to take [the appellant] away somewhere and she'd never be seen again." R. 251.
Dr. Rivenbark testified that the nature of the appellant's delusional disorder did not preclude her acting normally within certain areas of her life. R. 244. He explained that within other areas of her life, however, the appellant was impaired to the extent that she could not function rationally.
 "She appeared to be less impaired in the area of her vocation as an attorney, apparently was involved in working with cases and giving advice and so forth. I would not say she was fully functional, but she was not severely impaired. She was even able to carry on some social activities, but her social functioning was much more impaired. . . . She was not able to relate to people. She became very suspicious even of people she had known for a long time, was giving complaints to family and others about being watched and being spied upon, and her personal life became almost chaotic in that she tore up her telephones thinking they were bugged and did all kinds of things that made her personal life very disturbed and very chaotic and yet was able to work and function reasonably well." R. 244-45.
Dr. Rivenbark said that while the appellant "would have known [as a general rule that] it was wrong to take a shot at someone," R. 259, she "really thought she was in danger" from Officer Williams, R. 245, and "she was convinced that what she was doing [to Officer Williams] was appropriate and necessary," R. 263. Dr. Rivenbark testified that the appellant's behavior on August 4, 1991, was entirely consistent with the diagnosis of delusional disorder.
Lee Keene testified that he and the appellant had been close friends for seven years. They are both recovering alcoholics who had met at an Alcoholics Anonymous meeting. Keene said that a few weeks before the incident at issue here the appellant "went over the edge." R. 272. She told him that "somebody was bugging her house, you know . . . electronic listening devices." R. 273. When Keene went to the appellant's house, he saw that "she had totally dismantled every electronic thing in the house, all the radios, she'd taken them apart, all the tape recorders. . . . several hundred dollars worth of stuff and the telephones all completely dismantled. She even took the refrigerator apart." R. 274. Keene said that the appellant *Page 69 
had disconnected the power meter to the house, "just . . . took the whole meter off the wall. I don't know how she kept from being electrocuted." R. 275.
The appellant told Keene that there was a conspiracy against her and "[s]he thought everybody was in on it," including Alabama Power Company, South Central Bell, Townsend Ford, Pickens County, and the City of Gordo. R. 274. The appellant complained to Keene that her dog had been stolen and replaced with an impostor. She said that her father could "appear . . . or disappear when he want[ed] to." R. 277. The appellant asked Keene to swap cars with her because she thought hers was being followed. The appellant drove Keene's car to Birmingham to see a federal judge and when the courthouse was closed "she sat on the federal courthouse steps all night." R. 279. The appellant asked Keene to drive her around town in his car and they spent two or three hours riding around, with the appellant "in the floorboard so she couldn't be seen." R. 279. The appellant "wouldn't let [Keene] talk above a whisper because somebody [was] listening." R. 280. The appellant told Keene that she had called "the football coach at the University of Alabama" for help with "[w]hatever it was she thought was after her." R. 280.
On Friday, August 2, 1991, two days before the appellant's assault on Officer Williams, Keene met with three Tuscaloosa attorneys who knew the appellant. The group decided that "Monday morning [August 5, 1991] they would draw up papers to have [the appellant] involuntarily committed." R. 282.
Hank Hawkins was one of the three attorneys who met to plan involuntary commitment proceedings against the appellant. He had formerly worked with the appellant at Legal Services Corporation and characterized her as "an acquaintance." R. 285. A few weeks before the incident with Officer Williams, the appellant told Hawkins that "Gordo and Pickens County and the F.B.I. and the Alabama Power Company and everybody else, Townsend Ford . . . [was] conspiring to get her." R. 288-89. Hawkins concluded that the appellant was "delusional," R. 289, and suggested that she consult her psychologist, Dr. Jerry Hart. The appellant responded that "she did not need to do that, that there was nothing wrong, and she didn't trust Dr. Hart any more. She thought he was in the conspiracy." R. 296.
As chairman of an Alabama Bar Association subcommittee on substance abuse, Hawkins questioned the appellant about whether she had an alcohol or a drug problem. She replied that she had abused alcohol and had smoked marijuana in the past, but that she was not currently using either substance. Hawkins did not inquire about and the appellant did not mention Valium or diet pills.
"It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." Ala. Code 1975, §13A-3-1(a).
 "The general principles of law regarding the burden of proof and the defense of insanity were . . . set forth and considered in Christian v. State, Ala., 351 So.2d 623 (1977). Those principles may be summarized as follows:
 "1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury. [Now, under Ala. Code § 13A-3-1(c), '[t]he defendant has the burden of proving the defense of insanity by clear and convincing evidence.']
 "4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "5. In making its determination, the jury may reject all expert testimony though it is without conflict. *Page 70 
 "6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored.
". . . .
 "The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
 " 'Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.' Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583
(1934)."
Herbert v. State, 357 So.2d 683, 688-89 (Ala.Cr.App.) (bracketed material added), cert. denied, 357 So.2d 690
(Ala. 1978).
Although expert opinion is not binding on the jury and may be rejected, "it may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony." United States v. Hall, 583 F.2d 1288, 1294 (5th Cir. 1978), quoted in Ellis v. State, 570 So.2d 744, 752
(Ala.Cr.App. 1990). "A jury's verdict cannot be labeled arbitrary or patently erroneous if the jury had ample facts from which to draw an inference that the accused was in fact sane even if all the expert testimony was that he was insane."Bui v. State, 551 So.2d 1094, 1100 (Ala.Cr.App. 1988), affirmed,551 So.2d 1125 (Ala. 1989), vacated on other grounds,499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991).
In seven recent decisions, we have rejected arguments that the evidence of insanity was overwhelming and that the jury must have arbitrarily ignored the expert opinions. See Bass v.State, 585 So.2d 225 (Ala.Cr.App. 1991); Ware v. State,584 So.2d 939 (Ala.Cr.App. 1991); Ellis v. State, 570 So.2d 744
(Ala.Cr.App. 1990); Bui v. State, 551 So.2d 1094
(Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712
(1991); Westbrooks v. State, 492 So.2d 1023 (Ala.Cr.App. 1984);Sistrunk v. State, 455 So.2d 287 (Ala.Cr.App. 1984); andCunningham v. State, 426 So.2d 484 (Ala.Cr.App. 1982).
In those cases we held that, despite expert testimony to the contrary, the jury had objective reasons to find the accused sane. We determined that the factfinders were authorized — either from the circumstances of the offense itself, from some deficiency in the expert testimony, from the testimony of the accused, or from a combination of factors — to reject the expert opinion and to conclude that the accused was sane.
In Bass, this Court noted that the testimony regarding the accused's insanity was "substantial," but not "overwhelming."Bass v. State, 585 So.2d at 236. We found that the jury had objective reasons to discount expert testimony because "the appellant's actions and conduct immediately after the shooting — his statements acknowledging responsibility for the shootings and his request for an attorney — are indications of sanity." Id. at 235-36.
In Ware, both the circumstances of the offense and the ambiguity of the expert testimony provided the jury with a basis from which to conclude that the accused was sane. In that case, the jury could have found that the accused's attempt to conceal the victim's injuries indicated a consciousness of guilt and tended to show that he was legally accountable for his acts. In addition, "the testimony of the experts was subject to [the] interpretation" that the accused's voluntary intoxication short of insanity contributed to his criminal conduct. Ware v. State, 584 So.2d at 946.
In Ellis, this Court determined that the circumstances of the offense itself did not give the jury any reason to believe that the accused was sane. There, the accused stabbed her infant daughter and then attempted to commit suicide. However, this Court found that the jury could have doubted the adequacy of the factual basis for the expert's opinion and could have, for that reason or others, rejected the diagnosis of insanity. We noted that a jury has objective reasons to disregard an expert's opinion when the expert "based his findings solely on the defendant's description of [her] own symptoms, without verification by psychological testing and absent a past history of mental illness." Ellis v. State, 570 So.2d at 753. In addition, this Court found it significant that the accused's trial testimony regarding *Page 71 
past incidents of mental instability was a good deal more detailed than the accused had reported to her psychiatrist. We concluded that the jury may have determined that the accused's testimony was "manufactured, or at least creatively remembered, in light of her later becoming aware of the textbook symptoms of major depression." Id. at 754.
In Bui, we decided that an inference of sanity could have arisen from the circumstances of the offense. The jury was authorized to find the accused sane because his actions appeared to be prompted by "anger, revenge, and jealousy toward his wife, and not from the duress of a mental disease or defect." Bui v. State, 551 So.2d at 1105. This Court noted that "[t]he manner in which the act was planned, executed, or concealed may indicate such a consciousness of guilt and awareness of criminality that the question of sanity was for the jury even though all the expert defense testimony indicated that the defendant was insane." Id. at 1103.
We also concluded in Bui that the jury was authorized to reject the expert opinion that the accused was insane because the opinion was based on flawed methodology. The psychiatrist based his diagnosis on two very brief interviews with the accused. He did not talk to witnesses, the police, or the accused's family members. He did not administer any psychological tests. There was a discrepancy between his written report and his trial testimony. This court observed that "the lack of underlying data and logic to support the diagnosis of the psychiatrist is obvious." Id.
In Westbrooks, the facts of the case provided the jury with an objective reason to believe the accused was sane. There, the murder occurred during a heated argument between the accused and the victim. In addition, the expert testimony was inconclusive and equivocal. The psychologist testified that it was
 "difficult for us to come to a conclusion . . . [about] whether or not [the accused] was just faking this because he knew he was in a heap of trouble, and he was looking for some kind of defense or whether or not it was an authentic type of memory problem."
Westbrooks v. State, 492 So.2d at 1025. The expert witness simply could not state whether the accused "lacked the substantial capacity to appreciate the criminality of his conduct." Id. at 1026.
In Sistrunk, the circumstances of the offense itself suggested the accused's sanity. There was evidence that at the time of the offense the accused was intoxicated, that he was motivated by revenge, and that after the offense he fled. Furthermore, because the accused, like the defendant in Ellis, testified in his own defense, "[h]is demeanor and manner of testifying constituted evidence which was proper for the jury to consider in reaching [its] decision. . . . The jury could . . . decide whether or not [it] believed [the accused] was telling the truth about his intent at the time [of the alleged offense]." Sistrunk v. State, 455 So.2d at 290.
In Cunningham, the murder had an element of revenge. The accused had fled and had attempted to hide the murder weapon. In addition to those indicators of sanity, the jury could have discredited the testimony of the experts because their evaluations of the accused were based on comparatively short interviews conducted months after the offense. Under those circumstances, this court held that the jury verdict did not evince an arbitrary rejection of expert opinion.
In contrast to the foregoing decisions and others in which we have held that the evidence of the accused's insanity was not overwhelming and that, in finding the accused sane, the jury did not arbitrarily ignore the expert testimony, we cannot escape the conclusion in this case that the evidence of the appellant's insanity was both overwhelming and uncontradicted. The verdict of guilt indicates that the jury must have arbitrarily ignored the testimony regarding the appellant's mental state.
The expert opinion in this case, as distinguished from that in Ellis and Bui, was not weak, inconclusive, or methodologically flawed. Dr. Rivenbark's opinion about the appellant's mental state was not based primarily on the appellant's description of her own symptoms, but on psychological tests, a *Page 72 
social and family history, "a CT scan" of the appellant's brain, a drug screen, and voluminous records outlining the nearly identical conclusions of four other mental health professionals that the appellant was psychotic.
In contrast to Bass, Ware, Sistrunk, Cunningham, and other cases in which we determined that the sanity of the accused could be inferred from the circumstances surrounding the offense, the circumstances of the offense alleged here do not imply a sane actor. An inference of sanity could be applied to the defendants in the foregoing cases because they appeared to be prompted by the recognizable motives of revenge, anger, or jealousy. However, it is clear here, as it was in Clark v.State, 475 So.2d 657, 659 (Ala.Cr.App. 1985), and Alvis v.State, 434 So.2d 859, 864 (Ala.Cr.App. 1983), that the appellant's actions against Officer Williams were "bizarre, unprovoked, and without a rational basis."
The appellant's conduct on the night of August 4, 1991, did not indicate a consciousness of guilt or an attempt to conceal wrongdoing. The State's argument at trial that the appellant's sanity was demonstrated by her saying to Officer Williams, "I've got you now, Bitch," R. 109, is not supported by the evidence. While the appellant's statement was plainly indicative of her intent to assault Officer Williams, it was also clearly consistent with the evidence that the appellant was suffering from a delusion that the assault was necessary to ensure the appellant's safety.
The State also theorized at trial, and now maintains on appeal, that the appellant's actions took place during a "lucid interval." There was absolutely no evidence presented at trial to support that theory. Dr. Rivenbark testified that the nature of a delusional disorder contemplates areas of normal functioning, or lucidity, within the person's life. Dr. Rivenbark emphasized, however, that within the areas of her life in which the appellant was delusional — which included her conduct on August 4, 1991 — the appellant was unable to appreciate the wrongfulness of her acts.
Moreover, the State's own evidence belied any theory that the appellant was functioning within a "lucid interval" on the night in question. The testimony of two State's witnesses directly contradicted that theory. Sgt. Wilson described the appellant as "acting paranoid" when he first encountered her walking along McFarland Boulevard. Sidney Cannon said the appellant was "spaced out" and "acting very strange" in his store. The message dispatched over the police radio in response to Cannon's telephone call was "unwanted guest acting crazy." The other three State's witnesses — Officer Wheat, Officer Williams, and emergency room technician Mary Jackson — offered no testimony at all on the issue of the appellant's mental state.
Finally, the State argued at trial and now contends on appeal that the appellant's paranoia on the night of the offense was caused by her ingestion of Valium and diet pills. The great preponderance of the evidence established that the appellant's drug use merely exacerbated an existing psychotic disorder that continued even after the appellant's drug use stopped. However, even examining the evidence in the light most favorable to the State — i.e., that the appellant's drug use was the sole cause of her psychosis — the State's argument must fail. " '[I]f the accused is suffering from a settled or fixed insanity, even though caused by . . . alcoholic indulgence [or here, drug use], the rule is the same as in the case of insanity arising from any other cause.' " Lister v. State, 437 So.2d 622, 624
(Ala.Cr.App. 1983); West v. State, 511 So.2d 258, 262
(Ala.Cr.App. 1987). See also Beasley v. State, 50 Ala. 149
(1876). If the appellant was, as the result of a psychosis —of whatever origin — unable to appreciate the nature and quality of the wrongfulness of her acts, then she was legally insane.
We conclude, as we did in Herbert v. State, 357 So.2d 683,689 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala. 1978), that there was
 "nothing before the jury to rebut the great mass of testimony directly showing actual insanity before, at the time of, and after the act in question. In other words, there were simply no facts from which opposing inferences might have been rationally drawn." *Page 73 
The appellant was entitled to have a judgment of acquittal entered in her behalf. The judgment of the circuit court is reversed and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
TAYLOR, PATTERSON, and McMILLAN, JJ., concur.
MONTIEL, J., dissents with opinion.*
* When the court issued its opinion on December 29, 1994, Judge Montiel issued a dissenting opinion. On January 3, 1995, by order of the Court of Criminal Appeals, Judge Montiel's dissenting opinion was withdrawn and Judge Montiel was recused.