723 So.2d 696 (1996)
Eileen JANEZIC
v.
STATE.
CR-94-2338.
Court of Criminal Appeals of Alabama.
November 1, 1996.
Rehearing Denied January 17, 1997.
*698 Robert E. Willisson, Huntsville, for appellant.
Jeff Sessions and Bill Pryor, attys. gen., and Joseph Marston III, asst. atty. gen., for appellee.
TAYLOR, Presiding Judge.
The appellant, Eileen Janezic, was convicted of murdering Rev. Jerry Simon, a violation of § 13A-6-2, Code of Alabama 1975. She was sentenced to life in the state penitentiary.

I
The appellant contends that the trial court erred in denying her motion for a judgment of acquittal and, in the alternative, that the jury erred in finding that the appellant was not suffering from a mental disease or defect at the time of the shooting because, she says, the evidence that she suffered from a mental disorder was overwhelming.
The state's evidence tended to show that on August 26, 1993, the appellant shot and killed Rev. Simon at his church, Valley Fellowship Church, in Huntsville. The victim was shot three times and died as a result of a gunshot wound to his chest. The appellant was arrested, approximately one week later, after she shot another man outside the Parkway Medical Center in Decatur. The appellant, armed with a .32 caliber gun, held 30 policemen at bay at the Medical Center for approximately 8 hours. Police Officers testified that during the eight hours, she wielded a gun, smoked cigarettes, and was seen reading from a Satanic Bible.
Carol Simon, the victim's wife, testified that the appellant started coming to her husband's church around 1984 or 1985. She did not attend regularly and in 1989 the appellant asked her to testify on her behalf in a child custody case between her and her ex-husband. Simon said she refused. Carol Simon testified that sometime later the appellant approached the victim about testifying for her and the victim refused. Eventually, Carol Simon was subpoenaed to testify at the child custody hearing. The appellant lost custody of her two children. Over one year after the hearing, the appellant called Carol Simon and invited her to a meeting. Carol Simon said that she refused and that the appellant was very angry. The appellant did not return to Valley Fellowship Church. Carol Simon said that she saw the appellant some time later at a grocery store but that she did not recognize her because of the way she was dressed and the makeup she wore. Carol Simon also testified that Rev. Simon had performed exorcisms in the past.
Christopher Morgan, an employee of Range Time, testified that the appellant purchased a .32 caliber automatic handgun at Range Time, a shooting range that also sold handguns, on June 18, 1993. He further stated that as a requirement to purchase the handgun she had to complete a form which included questions about the mental stability of the purchaser. On the form the appellant indicated that she had not suffered from mental problems in the past.
There was no question that the appellant killed Rev. Simon. The appellant never contended that she did commit the murder. The appellant was seen, wearing a wig and fleeing the church after the murder. The appellant's defense at trial was that she was suffering from a mental disease at the time of the shooting and was therefore unable to appreciate the wrongfulness of her actions. A great deal of the testimony at trial concerned the appellant's mental health.
Charles Edward Carter testified that he met the appellant on August 27, 1993, the day after the shooting, at a bar and spent most of the next several days with her. He testified that as they were driving past the Valley Fellowship Church on August 28 they noticed a lot of activity. Carter testified that the appellant asked him to investigate. Carter testified that he dropped her off at her apartment, went back to the church, and discovered that they were conducting a wake for Rev. Simon. He testified that a few days later he and the appellant went to a restaurant and the appellant refused to enter because she said there were too many people inside. Carter further stated that he had seen the appellant pray to Satan. He also testified that he thought she was "stable."
*699 The appellant offered the testimony of numerous medical personnel, most of which concerned the appellant's mental condition in 1989. Dr. Alice Chenault, a psychiatrist, testified that the appellant was diagnosed as having a bipolar affective disorder in 1989 and that she was, at that time, involuntarily admitted to North Alabama Regional Hospital. Her condition stabilized with a treatment of lithium, a small daily dosage of Trilafon, and Cogentin. Dr. Chenault further testified that the appellant's condition was monitored and that she appeared to be in remission in July 1992 and was taken off lithium at that time. Dr. Chenault also testified that a person with a bipolar affective disorder can go in remission without medication and be stable or have a relapse. Dr. Chenault further testified that people with bipolar disorders had manic episodes, which can last from two weeks to months, and that these episodes are frequently followed by periods of depression.
Only two experts, who had interviewed the appellant after the offense and before trial, testified concerning the appellant's condition in 1993. Dr. Lawrence Maier, a clinical psychologist, testified that he assessed the appellant to determine if, in his opinion, she was competent to stand trial. Dr. Maier testified:
"The questions relating to competency are much more specific than the issues of mental illness generally or mental illness or not at the time of the crime. They have to do with one's ability to understand the charges against one's self. It involves being able to cooperate with one's attorney. It involves sufficient intelligence to understand the adversarial nature of what goes on in the courtroom. It involves the capacity to testify, if that should come up.
"There are 13 areas like that that go into one's determination of are you able toare you competent to stand trial. Mental illness does not equate to incompetency nor does insanity at the time of the crime equate to incompetency. It is a separate legal and psychological issue with specific points that may or may not be related to mental illness."
Dr. Maier testified that in his opinion the appellant was competent to stand trial, but that she suffered from a "major mental illness," which he characterized as a bipolar disorder. He testified that "she was seriously mentally ill at the time of the crime, [and] probably had been for a unknown period prior to the shooting." Dr. Roger Rinn, a psychologist, testified that the appellant "was probably very likely suffering from a schizo affective disorder and was psychotic at that time [of Simon's death]." Both experts testified that they were of the opinion that at the time of the killing the appellant was unable to appreciate the wrongfulness of her actions and that she was therefore suffering from a mental disease or defect at the time that she killed Rev. Simon and was unable to appreciate the wrongfulness of her actions.
Ramona Nelms testified on rebuttal that she had seen the appellant around the victim's church during a period of 9 to 10 days before the shooting. She stated that the appellant appeared to be watching everyone's movements.
As stated in § 13A-3-1, Code of Alabama 1975, "The defendant has the burden of proving the defense of insanity by clear and convincing evidence." Prior to 1988 the accused had to prove an insanity defense by a "preponderance of the evidence." As this court stated in Ware v. State, 584 So.2d 939 (Ala.Cr.App.1991):
"In 1988, the Alabama legislature replaced our insanity defense statute by enacting the `Reasonable Insanity Test Act of 1988,' 1988 Ala. Acts 1051, No. 88-654, now codified at Ala.Code § 13A-3-1 (Supp. 1990). Subsection (a) of that statute provides that:
"`It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.'
"Section 13A-3-1(a) is virtually identical to the federal insanity defense statute, 18 U.S.C. § 17(a) (1988), which `was passed in the wake of John Hinckley's acquittal of charges arising from his actions in shooting *700 President Ronald Reagan and Press Secretary James Brady.' United States v. Cameron, 907 F.2d 1051, 1061 (11th Cir. 1990).
"The new Alabama and federal insanity statutes represent a significant change from the insanity defenses previously available in criminal trials. Formerly, a defendant was not responsible for his criminal acts if `at the time of such conduct as a result of mental disease or defect he lack[ed] substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' Ala.Code § 13A-3-1(a) (1982 Replacement Vol.); United States v. Freeman, 357 F.2d 606, 622 (2d Cir.1966). It is clear that the new § 13A-3-1(a) is `substantially more restrictive' than its predecessor section. United States v. Brown, 899 F.2d 189, 192 (2d Cir.1990) (comparing 18 U.S.C. § 17(a) to the predecessor defense recognized in federal courts). Where the original § 13A-3-1(a) had both a `cognitive' test (lack of capacity to appreciate the criminality of the conduct) and a `volitional' test (lack of capacity to conform one's conduct to the requirements of the law), the new § 13A-3-1(a) has only a `cognitive' test (inability to appreciate the nature and quality or wrongfulness of one's acts). See United States v. Brown, 899 F.2d at 192; United States v. Cameron, 907 F.2d at 1061."
584 So.2d at 942.
This court defined clear and convincing evidence in D.D.P. v. State, 595 So.2d 528 (Ala.Cr.App.1991) as:
"`the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt. Addington v. Texas, 441 U.S. 418, 423-24, 99 S.Ct. 1804, 1807-08, 60 L.Ed.2d 323 (1979).' Matter of K.A., 484 A.2d 992, 995 (D.C.App.1984). See generally 9 J. Wigmore, Evidence § 2498 (Chadbourn rev.1981); E.Cleary, McCormick on Evidence § 340 (3d ed.1984); 32A C.J.S. Evidence § 1023 (1964)."
595 So.2d at 538. The defendant's burden of proving that he or she suffered from a mental disease or defect at the time of the offense is now higher than that required prior to the codification of the 1988 act at § 13A-3-1, Code of Alabama 1975.
As this court stated in Haynes v. State, 644 So.2d 1281, 1282-83 (Ala.Cr.App.1994), concerning an expert's testimony on the issue of insanity:
"We have held that, `the opinions of expert witnesses as to insanity are not conclusive on the jury, but are weighed like other evidence, and the jury may reject all expert testimony, though it is without conflict.' Flenory v. State, 588 So.2d 940, 942 (Ala.Cr.App.1991), quoting Smith v. Smith, 254 Ala. 404, 48 So.2d 546 (1950).
"`Moreover, the fact that all of the expert witnesses testified for the defense is not a reason to overturn the jury's verdict because "[a] factfinder is not bound by expert testimony `even if all of the witnesses are presented by only one side.'" Ellis v. State, 570 So.2d 744, 752 (Ala.Cr.App.1990), quoting United States v. Pitts, 428 F.2d 534, 536 (5th Cir.), cert. denied, 400 U.S. 910, 91 S.Ct. 154, 27 L.Ed.2d 149 (1970).'

"Hill v. State, 620 So.2d 143, 144 (Ala.Cr. App.1993). Thus, the fact that the state failed to present a rebuttal witness does not require us to overturn the jury's verdict. The jury, in weighing the credibility of the evidence, has the right to disbelieve all of the evidence or to disbelieve any part of it."
See also Hamilton v. State, 680 So.2d 987 (Ala.Cr.App.1996).
There was evidence presented that the appellant purchased a gun before the killing and that she had the presence of mind to be untruthful on the forms she filled out to obtain the gun by stating that she had never had any mental problems. There was also evidence presented that the appellant wore a disguise to commit the murder and that she fled immediately after committing the murder. Evidence was also presented that the appellant had asked the victim and his wife to testify on her behalf at a child custody hearing. Carol Simon testified that Rev. Simon refused. This testimony offers a motive, i.e., revenge. Furthermore, the jury *701 had the opportunity to view the appellant and her demeanor during the trial.
This court, in Cunningham v. State, 426 So.2d 484 (Ala.Cr.App.1982), reviewing a judgment of guilt when a defendant raised the insanity defense, faced a situation similar to the one presented here. In Cunningham, experts testified that the manner in which the crime was conducted, the flight from the scene of the crime, and the fact that a motive for the crime was revenge, negated the insanity defense. We stated:
"`Thus, where the whole evidence does not satisfy the minds of the jury that the accused is insane at the time of the commission of the crime with which he is charged, the jury should convict the defendant, notwithstanding that the medical witnesses were of the opinion that such person was insane.' 31 Am.Jur.2d Expert And Opinion Evidence, Section 186 (1967). The very manner in which the crime was planned, executed or concealed may indicate such a consciousness of guilt and awareness of criminality that the question of sanity was for the jury even though all the expert defense testimony concluded that the defendant was insane. Boyle [v. State], 229 Ala. [212] at 224, 154 So. 575 [(1934) ].
"A review of all the evidence in this case reveals that the jury's verdict was neither arbitrary nor based solely on the statutory presumption of sanity. There was evidence to support a finding that the defendant was legally responsible for the murder.
"At trial, the evidence presented by the defendant consisted solely in the expert testimony of a clinical psychologist with the Huntsville-Madison County Mental Health Center and a staff psychiatrist with Bryce State Mental Hospital. Both experts testified that the defendant was a paranoid schizophrenic. The defendant had a history of mental illness. Their testimony authorized, but did not compel, a verdict of not guilty by reason of insanity.
"Despite the strength and impressive nature of their testimony, there were also facts which authorized the reasonable inference that the defendant was sane. The victim was stabbed once in the back. Almost immediately after the stabbing the defendant `took off' and tried to flee when he spotted the police. `Hiding or attempted escape has been admitted as evidence of sufficient sanity to be conscious of guilt.' Weihofen[, Mental Disorder As A Criminal Defense] at 315. `Flight from justice, and its analogous conduct, have always been deemed indicative of a consciousness of guilt.' 2 Wigmore, Evidence Section 276(4) (Chadbourn rev.1979). Ordinarily, the issue of insanity is for the jury where the evidence discloses `conscious guilt' at the moment of the crime. Boyle, 229 Ala. at 224, 154 So. 575.
"....
"There was an element of revenge in the murder. The defendant told the police that about a month before the killing the victim threw a package of cigarettes at him, cursed him and sold him gasoline that contained water. After that the victim's spirit `took possession' of the defendant's body. The defendant admitted stabbing and killing the victim as `the only way to get rid of the man's spirit.' Statements of the accused shortly after the commission of the crime showing hostility toward the victim are properly admitted to allow the jury `to be enabled properly to characterize the act.' Kilpatrick v. State, 213 Ala. 358, 362, 104 So. 656 (1925).
"....
"The defendant's conduct and demeanor immediately after the crime provided a reasonable inference of sanity. Although the experts testified that this conduct was not inconsistent with insanity, whether it was consistent or inconsistent presented a question for the jury. `(C)almness, indifference to results, consciousness of the moral or legal criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive evidence of sufficient sanity to justify criminal punishment, are nevertheless strong circumstances tending to prove legal accountability.' Boswell [v. State,] 63 Ala. 307, 320, 35 Am.Rep. 20 (1880)."
426 So.2d at 490-91.
This court in McFarland v. State, 581 So.2d 1249, 1254 (Ala.Cr.App.1991) reviewed *702 a judgment of guilt in a case in which the defendant had previously been found to be insane. In McFarland, we stated:
"To succeed with the affirmative defense of not guilty by reason of mental disease or defect, appellant must show that, at the time of the acts constituting the offense, he was, as a result of severe mental disease or defect, unable to appreciate the nature and quality or wrongfulness of his acts. § 13A-3-1. A `"[s]evere mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.' Id. `Unusual or weird behavior alone cannot be equated with ... insanity.' Moss v. State, 536 So.2d 129, 135 (Ala.Cr.App.1988) (quoting Meredith v. State, 370 So.2d 1075, 1078 (Ala.Cr.App.), cert. denied, 370 So.2d 1079 (Ala.1979)). In order to overcome the presumption of sanity, a defendant must prove by clear and convincing evidence that he was, in fact, suffering from a severe mental disease or defect at the time the crime was committed. Id. See also Wherry v. State, 402 So.2d 1130, 1132 (Ala.Cr.App.1981).
"The record contains no evidence that appellant suffered from a mental defect or disease during the time when the instant crime occurred. Appellant relies on a determination made by a psychiatrist in 1974 that he was insane at that time. However, appellant concedes that approximately one year later he was released from Bryce Hospital after he was found to be competent. Appellant further relies upon two previous unrelated criminal court proceedings in which he entered pleas of not guilty and not guilty by reason of insanity. He seems to argue that such pleadings should have alerted his instant trial counsel to investigate this approach more thoroughly. However, appellant fails to point out that in both cases he withdrew those pleas and pleaded guilty. Other events and conditions contained in the record are as follows: At the time of the crime, appellant suffered from epilepsy, but failed to take his medication for this condition. He suffered from memory loss, also during this time, as to what he was doing or where he was going. He was diagnosed as suffering from hydrocephalus (an excess amount of spinal fluid in the cranial cavity) by a doctor in 1989. Appellant also had `erratic' brain waves in October 1989. Appellant's mother said that he received brain damage in a car accident and that, at the age of 17 years, appellant's father severely beat him about the head. She also stated that, on one occasion, she found in his room a shirt `stuffed like a body's head' and found many articles of women's clothing. Appellant occasionally dressed in women's clothing. While in his mid-thirties, appellant and his mother were required to move from their home because appellant threw rocks at his neighbor's trailers. While this evidence may reflect the fact that appellant suffers, or has suffered from, different ailments and has occasionally indulged in unusual or weird behavior, it does not clearly and convincingly indicate that, at the time of the instant crime, he was suffering from a mental disease or defect."
581 So.2d at 1254.
Furthermore, "Even where it is shown that an individual is subject to spells of insanity, the law presumes that the crime he committed occurred during a lucid interval." Westbrooks v. State, 492 So.2d 1023, 1025 (Ala.Cr.App.1984). See also Haynes v. State, 644 So.2d 1281 (Ala.Cr.App.1994).
It was the duty of the jury in this case to determine whether the appellant was sane or insane when she killed Rev. Simon. It is not for this court, based on the evidence presented, to second-guess the jury. There was amply evidence presented to prove that the appellant understood the wrongfulness of her actions when she shot and killed Rev. Simon.

II
The appellant further contends that the trial court erred in denying her motion to quash the jury venire that was called for her competency hearing. Specifically, she contends that the venire should have quashed because of its exposure to allegedly prejudicial pretrial publicity.
The following occurred:
"Mr. Burgess [defense counsel]: Your Honor, we would alsoAt this time, the *703 defendant would move to quash this panel due to the disproportionate number of individuals who have heard about the case. My experience has been that once individuals have knowledge of a matter, and we don't know what they may have read in the paper, that it is very difficult for them to put that out of their mind and not to take that into account. Since there was approximately three-quarters of this panel that had prior knowledge of this case, we would move this panel be quashed and we strike another one. We have just begun this voir dire. I think it can be done without taking too much time and doing violence to our schedule.
"Mrs. Moquin [prosecutor]: Judge, I have no position in that regard.
"The Court: Well, I suspect that, without knowing, we will be met with the same situation because of the unusual nature of this case and the publicity that the murder itself received. I guess the critical issue here is whether these jurors can put all of that out of their mind, listen to what we have presented in this courtroom, and they have all averred thus far that they could except for [M.Y.], so I am going to deny that motion."
In determining whether to grant a motion to quash the venire, this court applies the standard articulated by this court in Gwin v. State, 425 So.2d 500 (Ala.Cr.App. 1982), writ quashed, 425 So.2d 510 (Ala.1983). In Gwin we stated:
"`A motion to quash the venire should not be sustained or granted unless it is alleged and proved that the whole venire is tainted with prejudice.' Harris v. State, 394 So.2d 96, 98 (Ala.Cr.App.1981); Anno. 76 A.L.R.2d 678 (1961). This rule holds true even where some of the veniremen have been exposed to adverse newspaper publicity. Nickerson v. State, 283 Ala. 387, 217 So.2d 536 (1969).
"There is no evidence contained in the record that even a single venireman read the allegedly prejudicial newspaper reports or had any knowledge of the facts of this case. Moreover, juror exposure to news accounts of the crime with which an accused is charged does not alone presumptively deprive the accused of due process of law. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). `Qualified jurors need not, ... be totally ignorant of the facts and issues involved.' Murphy, 421 U.S. at 799-800, 95 S.Ct. at 2036.
"It is not the mere fact that a person has a personal or fixed opinion as to any of the issues involved in a criminal prosecution which renders that person incompetent to serve as a juror. However, a person is not qualified to serve as a juror where his opinion is so fixed that it would influence his decision so that he could not lay aside his opinion and try the case fairly and impartially according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231, 234 (Ala.Cr.App.1977), cert. denied, 356 So.2d 234 (Ala.1978).
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'

"Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).
"`(T)he burden is on defendant to show to the reasonable satisfaction of the trial court that a fair and impartial trial and an unbiased and unprejudiced verdict cannot reasonably be expected.' Nickerson, 283 Ala. at 390, 217 So.2d 536.
"Where there is no record before this Court of any testimony taken in support of a defendant's motion to quash, this Court is unable to determine whether the allegations of the motion are true and cannot charge error to the trial judge in overruling the motion. Taylor v. State, 32 Ala. App. 570, 28 So.2d 318 (1947).
"As in Nickerson and Goldin v. State, 271 Ala. 678 127 So.2d 375 (1961), `we are left unconvinced, nor was it made apparent to the trial court, that the appellant could not, on account of these newspaper articles, *704 have received a fair trial.' Goldin, 271 Ala. at 680, 127 So.2d 375."
425 So.2d at 503.
There was no showing here that the members of the venire were so infected by pre-trial publicity that they were unable to render a fair verdict.

III
The appellant next contends that during voir dire one member of the venire failed to answer a question properly and thereby denied the appellant her right to have truthful answers from the prospective jurors.
The record reflects that defense counsel conducted an extensive voir dire examination. Prospective jurors were asked if they had had mental health problems and if they had ever been treated by Dr. Roger Rinn, one of the defense witnesses in the case. One of the prospective jurors answered that she had been treated by Dr. Rinn when she was in high school and that her previous association with Dr. Rinn would not affect her ability to be impartial. Several questions later, counsel asked the prospective jurors if they knew any of the people involved in the case. This prospective juror did not respond to this question. The appellant contends on appeal that this failure to answer denied him his right to have jurors answer questions truthfully during voir dire.
As this court stated in Washington v. State, 539 So.2d 1089 (Ala.Cr.App.1988)
"It is not `any failure of any prospective juror to respond properly to any question regardless of the excuse or circumstances [that] automatically entitles a party to a new trial or reversal of the cause on appeal.' Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330 (1970) (emphasis in original). `[T]he proper inquiry ... is whether this has resulted in probable prejudice to the movant.' Id."

539 So.2d at 1095.
It is clear that we do not a situation here where a juror failed to disclose information. No prejudice existed because the juror had already answered that she had been a patient of Dr. Rinn's in high school, which certainly revealed that she knew the doctor. No rights were violated here.

IV
The appellant further contends that the trial court erred in denying her motion to suppress evidence discovered during a search of the appellant's apartment, which was conducted pursuant to a search warrant. Specifically, he contends that the warrant issued was based on a "barebones affidavit."
Initially, we observe that the affidavit supporting the warrant to search the appellant's apartment was not made a part of the record for this court's review. As this court has previously stated:
"The search warrant and supporting affidavits are not in the record. This, in itself, precludes our review of the trial court's ruling on either the sufficiency of the underlying circumstances supporting the search warrant, or the limits of the search which may be conducted pursuant to the warrant. This Court cannot review rulings respecting written instruments not contained in the record. Barbosa v. State, Ala.Cr.App., 331 So.2d 811 (1976); Seibold v. State, 287 Ala. 549, 253 So.2d 302 (1970); Woodall v. Malone-Harrison Motor Company, 219 Ala. 366, 122 So. 357 (1929).
"In Barbosa, supra, officers, armed with a warrant to search the appellant's apartment, also searched his automobile which was parked adjacent to the apartment building. The appellant contended that the warrant for the search of the apartment did not extend to the automobile. There, the State contended that since the automobile was parked within the curtilage, it was included within the warrant. On that point, we stated:
"`... Since the warrant appears nowhere in the record, and was introduced by neither the State nor the defense, we are unable to declare what the warrant encompassed....'
"Further in the testimony of Officer Watkins, he recited, in camera, the items taken in the course of the search of the premises. Appellant objected to the introduction of the silver found in a search of his car, claiming that the warrant did not *705 cover the automobile. The trial court overruled his motion to exclude the silver, however, when the jury was returned to the courtroom and Officer Watkins resumed his testimony, only those items found in the house and on the person of the appellant were introduced into evidence. The silver obtained in the search of the automobile was not introduced or testified to by Officer Watkins in the presence of the jury. Therefore, the trial court's ruling that the silver found in the car was admissible would not amount to prejudicial error where it was not in fact introduced. Rule 45, Alabama Rules of Appellate Procedure."
Mayes v. State, 350 So.2d 339, 342-43 (Ala. Cr.App.1977). See also Durden v. State, 394 So.2d 967, 972-73 (Ala.Cr.App.1980), writ quashed, 394 So.2d 977 (1981).
However, the affidavit was read in part into the record. The affidavit read in part:
"`On Thursday, August 26, 1993, Jerry Glenn Simon was shot while at this place of employment. The victim Jerry Simons was shot with a .32 caliber weapon. A witness at the crime scene stated that a white female, small in size, was seen running from the scene after the shooting.
"`On Friday, September 3 1993, there was a white female who shot a subject in Decatur, Alabama, and was taken into custody. The defendant in Decatur's shooting used a .32 caliber Davis automatic handgun, and matched the description of the female running from the shooting in the Huntsville shooting of Jerry Simon. On this date the weapon that was taken from the defendant in Decatur, Eileen Janezic, was compared by John Kilbourne, from the Department of Forensic Science, and stated that the weapon used in the Decatur shooting and the Huntsville shooting of Jerry Simon are the same weapon.'"
As the state contends in its brief to this court, this affidavit clearly satisfied the standard articulated by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause exists when "a reasonably prudent person, based on the facts and circumstances which the officer knows would be justified in concluding that the items sought are connected with criminal activity, and that they will be found in the place to be searched." Wedgeworth v. State, 610 So.2d 1244, 1247 (Ala.Cr.App.1992).

V
The appellant last contends that the trial court erred in denying her motion for a mistrial made when a .38 caliber bullet was received into evidence at trial. Officer Glenn Nunley testified that he was called to the scene of the church about one month after the shooting and that he retrieved a .38 caliber bullet from a handrail at the church. The state moved to admit this bullet into evidence. The evidence clearly showed that the victim was shot and killed with a .32 caliber bullet.
The trial court denied the motion for a mistrial but instructed the jury to disregard any reference to the .38 caliber bullet. "`There is a prima facie presumption against error when the trial court immediately charges the jury to disregard improper remarks or answers. Desimer v. State, 535 So.2d 238 (Ala.Crim.App.1988); Dixon v. State, 476 So.2d 1236 (Ala.Crim.App.1985); Elmore v. State, 414 So.2d 175 (Ala.Crim. App.1982).'" Walker v. State, 631 So.2d 294 (Ala.Cr.App.1993), quoting Garrett v. State, 580 So.2d 58, 59-60 (Ala.Cr.App.1991). See also Daniels v. State, 650 So.2d 544 (Ala.Cr. App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995).
For the foregoing reasons, the judgment is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur except PATTERSON, J., who dissents with opinion and in which COBB, J., joins.
PATTERSON, Judge, dissenting.
Much to my surprise, the majority fails to mention, much less consider, the following contentions raised by Eileen Janezic:
"III. The court erred in denying defendant's motion for an acquittal or a directed verdict [in the competency hearing before *706 a jury] for the reason that the state failed to meet its burden of proof to show that the defendant was competent by clear, unequivocal and convincing evidence."
"IV. The jury verdict of competency is not supported by clear, unequivocal, and convincing evidence."
"VII. The trial court erred in overruling defendant's motion for directed verdict of acquittal for failure of the state to make its case."
"X. The trial court erred in finding defendant competent for the purpose of sentencing."
"XI. The trial court erred in denying defendant's motion for new trial."
I find this omission to be particularly disturbing because of the glaring error in regard to the issues pertaining to Janezic's competency to stand trial. The uncontradicted testimony unequivocally shows that Janezic was not competent to stand trial. Therefore, I must dissent from the affirmance of Janezic's conviction and sentence, on the ignored but grave question of Janezic's competency. I cannot go along with the majority in ignoring this issue or with the trial court, which, after taking evidence in a post-verdict hearing of her incompetency to stand trial and after adjudicating Janezic incompetent to be sentenced, declined to take any affirmative action on Janezic's motion for a new trial on the ground that she was incompetent to stand trial and allowed it to be denied by operation of law.
The issue of competency is essential to Janezic's right to a fair trial and to the reliability of the jury's verdict, as illustrated by the following recent observations of a unanimous United States Supreme Court:
"No one questions the existence of the fundamental right that petitioner invokes. We have repeatedly and consistently recognized that `the criminal trial of an incompetent defendant violates due process.' Medina v. California, 505 U.S. 437, 453, 112 S.Ct. 2572, 2581-2582, 120 L.Ed.2d 353 (1992): Drope v. Missouri, 420 U.S. 162, 171-172, 95 S.Ct. 896, 903-904, 43 L.Ed.2d 103 (1975); Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). Nor is the significance of this right open to dispute. As Justice Kennedy recently emphasized:
"`Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so. Drope v. Missouri, 420 U.S. 162, 171-172, 95 S.Ct. 896, 903-904, 43 L.Ed.2d 103 (1975).' Riggins v. Nevada, 504 U.S. 127, 139-140, 112 S.Ct. 1810, 1817-1818, 118 L.Ed.2d 479 (1992) (opinion concurring in the judgment.)"
Cooper v. Oklahoma, 517 U.S. 348, 354, 116 S.Ct. 1373, 1376-77, 134 L.Ed.2d 498 (1996) (emphasis original).
Furthermore, I cannot agree with the majority's decision in regard to the jury's finding that Janezic was sane at the time of the offense. The arbitrary rejection of Janezic's insanity defense flies in the face of overwhelming, uncontradicted, and unimpeached evidence that she was insane at the time of the offense. As the following discussion shows, the majority's conclusions are based on inferences that are not supported by the record.
In drawing these conclusions on which I base my dissent, I have been most mindful of the admonition that "courts should be careful not to invade the province of the jury in cases of this character." Boyle v. State, 229 Ala. 212, 222, 154 So. 575 (1934). Yet, I do not hesitate to agree with the court's observation in Boyle, commenting on its review of the issue of the jury's finding of sanity, that the reviewing court must reckon with the reality that "[i]t is the application of [the] law *707 [regarding the defense of insanity] to the facts of the case that brings responsibilities and difficulties of the gravest sort." Id. at 222, 154 So. at 584.

I. FACTS
I will undertake a more detailed discussion of the facts than that contained in the majority opinion. See Nichols v. State, 276 Ala. 209, 211, 160 So.2d 619, 621 (1964) ("Where insanity is relied upon as a defense, every act of the accused's life which throws some light on such issue is relevant thereto."). I believe this discussion is necessary to a complete understanding of the issues of insanity and incompetency.
The facts bearing on Janezic's mental condition are not in dispute. Briefly stated, the record shows that Janezic has an extensive history of severe mental illness. There is no dispute about the severity of her disease. She was first diagnosed in 1989 as having a major mental illness categorized as either bipolar disorder (also called manic depressive disorder) with psychosis or schizo-affective disorder. In the succeeding years, Janezic's diagnoses grew progressively worse as her mental illness became more severe. Notably, the state's failure to treat Janezic's condition during the period in which she was in custody pursuant to arrest (from September 1993 to November 1994) has caused an irreversible deterioration of her mental state. As of November 1994, the psychiatrists and psychologists with the Alabama Department of Mental Health have agreed that Janezic suffers from acute paranoid schizophrenia. This disease is among the most severe thought disorders known and is incurable.

A. FACTS BEFORE THE TRIAL JURY ON THE ISSUE OF JANEZIC'S SANITY
There was testimony at trial that as a child, Janezic was "very hyper." She was always in motion, had difficulty concentrating, and was poorly adjusted both socially and academically. She married Tim Jeffcoat and bore two daughters, the younger of whom is severely retarded. In 1986, she divorced Jeffcoat and was awarded custody of both children. She married Bob Janezic in 1989, and shortly thereafter began to complain that people were "after" her. She also began to exhibit unusual behavior, wearing strange clothes and odd makeup. At that point, her mother concluded that Janezic was very sick.
In August 1989, the Department of Human Resources petitioned to have Janezic's children removed from her custody. The petition alleged that Janezic was suffering from bipolar syndrome with manic features; that she had refused doctors' recommendations that she be hospitalized; that she was residing at the Rescue Mission for Women in Huntsville; that she had left her 10-year-old child alone to care for the severely retarded 8-year-old; and that she was unable to properly care for her children. Her first attorney withdrew from the case over a disagreement as to strategy: he wished to portray her as stable, but she wished to color the proceedings as a religious persecution. Dr. William Goodson evaluated Janezic on September 12, 1989, at her mother's request. He concluded that, at that time, she had a major mental illness categorized as either bipolar disorder with psychosis or schizo-affective disorder. Janezic denied that she was ill and refused medication.
At the custody hearing on September 14, 1989, Janezic wore heavy, blue eye makeup with symbols resembling wings painted above both eyes. She testified that she was a prophet. She subpoenaed Simon's wife, and asked her to corroborate this claim. Mrs. Simon's testimony at the murder trial was that, although she could not remember the contents of her testimony at the custody hearing, she did not consider that testimony to be useful to Janezic. Janezic lost custody of her children. It appears that every attorney involved in the custody proceeding testified at this trial in Janezic's defense. Without exception, each attorney, including those who had represented Janezic, testified that he or she believed that Janezic was of unsound mind at the time of the custody hearing.
Within two weeks of the custody proceeding, Janezic was evaluated by Dr. Trevor Lindsay. He concurred with the diagnosis previously made by Dr. Goodson. Janezic *708 again denied that she was ill. Lindsay prescribed lithium carbonate for her bipolar disorder and Trilafon to alleviate her psychotic features. Janezic refused to follow Lindsay's recommendation that she remain at the hospital for treatment.
During the autumn of either 1989 or 1990, Janezic met with Simon in his office at the Valley Fellowship Church.[1] On this occasion, Simon's daughter-in-law was seated outside Simon's office and overheard the 15- to 20-minute conversation between Simon and Janezic, which she characterized as calm and peaceful. In sum, according to the daughter-in-law, Janezic asked Simon whether God or angels speak to people; she told Simon that God told her how to dress and how to pray; and she asked Simon whether he believed that her religious beliefs were correct.
On November 9, 1989, Madison County Circuit Judge William Page conducted a hearing and found probable cause to believe that Janezic was mentally ill and posed a threat to herself or to others. On November 15, 1989, a second hearing was held to determine whether Janezic should be involuntarily committed to the custody of the Department of Mental Heath and Mental Retardation. At that hearing, Madison County Probate Judge Frank Riddick found by clear and convincing evidence that Janezic was mentally ill; that as a consequence of her mental illness, Janezic posed a real and present threat of substantial harm to herself or to others; that the threat of substantial harm was evidenced by a recent overt act; that treatment for Janezic's mental illness was available; and that commitment was the least restrictive alternative for treatment of Janezic's mental illness. See generally, §§ 15-16-41 and -43, Code of Alabama 1975 (procedures for involuntary commitment to a mental institution). At the murder trial, both Judge Riddick and the attorney who represented Janezic at her commitment proceeding testified that, in their opinions, Janezic was not of sound mind at the time of her commitment proceeding.
After her commitment, Janezic began regular treatment for her mental illness. This treatment involved medication, frequent consultation and evaluation by a therapist, and periodic evaluations by psychiatrists. Janezic's medical records showed that her mental illness had been characterized by severe moods swings and frequent dissociation from reality. She had been preoccupied with religion, and she had claimed that she heard God or Satan talking to her and that she possessed the gift of prophesy. According to her psychiatrists, however, the medication stabilized Janezic's condition. Throughout her treatment, the level of Janezic's medication was closely monitored by regular blood tests.[2]
By 1992, she had divorced Bob Janezic. She was no longer hospitalized, but her blood tests showed that her lithium levels were falling. In February 1992, she stopped taking Trilafon (the antipsychotic medication), and the following month, her therapist received a disturbing letter. That letter, written by a friend of Janezic's family, was placed in Janezic's medical file. It stated that Janezic's spiritual visions had resumed, that she was acting as if she was "on speed," and that she had reported the following: that God and angels were talking to her again; that she believed her sister-in-law to be the reincarnation of Bathsheba; that she believed that a group of Satanic worshippers was torturing her boyfriend and mutilating other people; and that she was seeking protection from these alleged Satanists.
On June 3, 1992, Janezic's therapist noted that blood tests showed Janezic's lithium levels to be well below the therapeutic range and that her mental condition appeared to be deteriorating. The therapist recommended that Janezic's medication be increased. However, in July 1992, Janezic told her psychiatrist that the medication made her feel "slowed down" and depressed, and she requested *709 that her medication be decreased. In accordance with this request, the medication was tapered off over the period of a month, after which it was terminated altogether. The testimony indicates that, at that stage of Janezic's civil commitment proceeding, the physicians were prohibited from forcing Janezic to take medication against her will. Therefore, the acquiescent decrease in Janezic's medication cannot be construed as a reflection of any medical opinion regarding Janezic's condition at that time.
The majority's conclusion that in July 1992 Janezic was in remission and its implication that this remission was the reason that Janezic was taken off of her medication are clearly contradicted by the record. It appears that after September 25, 1992, Janezic received no further medical attention until she was arrested.
Ramona Nelms testified that on July 23, 1993, she saw Janezic for the first time, standing at an intersection on the road on which Valley Fellowship Church was located, approximately one quarter of a mile from the church building. Nelms saw Janezic at the same location for nine or ten days. Sometimes Janezic stood in the same spot for over one hour. Nelms testified that each time she saw her, Janezic appeared to be scrutinizing the occupants of passing automobiles as if she were looking for someone.
At 3:40 p.m. on August 26, 1993, Janezic was seen in a Huntsville area parking lot. She was rummaging through the hatch-back of her blue Honda automobile and throwing paper and cans out into the parking lot. She had a small build and wore strange, heavy makeup. Her blonde bangs were exposed beneath a crooked, reddish-brown wig. She was characterized by a witness as "desperately looking for something." Twenty minutes later, Rev. Simon was shot three times as he was leaving the Valley Fellowship Church in Huntsville. There were no eyewitnesses. Simon's wife, who was in another part of the church building when she heard the shots fired, found Simon collapsed in front of the door. She noticed a reddish-brown wig on a nearby tree, but she saw no one in the parking lot. A few minutes after Simon was shot, Janezic was observed running or jogging away from the church. Janezic was not wearing a wig and her blonde hair was pulled up in the back. The record suggests that she may have left her car parked in the church parking lot. When the police arrested Janezic one week later, she had in her possession a .32 caliber gun that was subsequently proven to be the murder weapon.
The night after Simon's death, Janezic went to the Silver Dollar Lounge, a Huntsville nightclub, where she met Charles Edward Carter. Janezic and Carter spent most of the evening at the club, drinking heavily, dancing, and getting acquainted. Around 1:00 a.m., Janezic and Carter left the bar in Janezic's car and went to her apartment together. When they arrived, Janezic arranged colored stones on a table and prayed to "Lucifer" for approximately 20 minutes. Carter declined to participate, but he spent that night with her.
On the following day, August 28, 1993, Janezic and Carter drove past Valley Fellowship Church and saw a group of people in the parking lot. Janezic said, "I wonder what's going on?" Later, at Janezic's request, Carter returned to the church to find out what was happening. He was told that it was a wake for Simon. A few days later, Carter and Janezic drove to a restaurant to eat dinner; however, when they arrived, Janezic refused to get out of the car. She said that too many people were in the restaurant and that she felt uncomfortable going inside.
On August 30 or 31, 1993, Janezic went to an office of the Madison County license department to attempt to renew her automobile tag. After some confusion, the license clerk realized that Janezic had renewed her tag in July, when it had been due.
On September 3, 1993, Janezic was in Decatur at the Parkway Medical Center.[3] At 4:00 p.m., she left the medical center by the front door. Jimmy Thorne was sitting on a bench on the grounds of the medical center, waiting for his wife. When Janezic exited *710 the building, Thorne turned and saw her approximately 15 to 20 feet from him. Thorne looked a second time, and saw Janezic reach into her purse and remove a large object, apparently a gun. Startled, Thorne jumped up, and Janezic shot him.[4] The bullet pierced Thorne's arm and grazed his chest. He ran, but Janezic pursued him, firing two errant shots. Thorne had never seen Janezic before and had no previous interaction with her. Police responded to the shooting and found Janezic at the medical center. For eight hours, she held 30 police officers at bay. During that time witnesses said that she was carrying a gun, reading a Satanic bible, smoking cigarettes, and walking around both inside the medical center and outside onto the sidewalk. She occasionally pointed the gun at the police officers, but she never shot at them. She was ultimately arrested.
At the trial, nine women who were incarcerated with Janezic at the Madison County jail testified to Janezic's behavior in jail. The length of their exposure to Janezic ranged from 1 week to 90 days. During that time, Janezic was receiving no medical treatment and taking no medication. They testified that they could see or hear Janezic at all times and that her actions were very unusual. She regularly sat in a corner of her cell, behind a curtain fashioned from a bed sheet, and talked to people who were not present. She frequently addressed one party in these imaginary conversations as "Papa Lu," apparently a reference to the devil. During these conversations, Janezic used three different voices: one was described as resembling a little girl's, one was described as "gruff"like a man's, and the other was her usual voice. The conversations were virtually incessant. She slept little, had to be reminded to eat, and even when reminded, ate very little. She "barked like dogs and hissed like cats." However, when approached by the jail staff or by church personnel, Janezic discontinued her odd behavior. The testimony of the jailmates was consistent, and each woman testified that in her opinion Janezic was mentally ill when she was in jail.
While awaiting trial for Simon's murder, Janezic was evaluated by two psychologists. Dr. Lawrence Maier, a private practitioner contracted by the Alabama Department of Mental Health and Mental Retardation, was appointed by the court to examine her, pursuant to the state's request. He had previously examined Janezic in 1989 in connection with her commitment proceedings. At that time, he agreed with the other doctors' diagnosesthat Janezic was bipolar manic and psychoticand he found her to be "strikingly delusional." After Janezic's arrest for Simon's murder, Maier reviewed Janezic's medical records, conducted several extensive interviews and evaluations of Janezic, and administered several diagnostic tests. The tests were inconclusive; however, Maier testified that these results were consistent with Janezic's "high defensiveness" and with her continued insistence that she was not mentally ill. Pursuant to these observations, Maier updated his previous diagnosis and stated that Janezic's mental illness had become more severe. Ultimately, Maier testified that in his opinion Janezic suffers from schizophrenia,[5] the most severe mental disease, and that as a result she was unable to appreciate the nature and quality or wrongfulness of her conduct at the time she killed Simon.
Dr. Roger Rinn testified that he had examined Janezic on behalf of the defense in preparation for this trial. His methodology was similar to that of Dr. Maier; however, he concluded that at that time Janezic suffered from schizo-affective disorder with psychotic features, rather than from schizophrenia. Rinn explained that, although several psychiatrists and psychologists who had examined Janezic from 1989 through 1994 had reached different conclusions as to which specific mental disease Janezic suffered from at the times of the various evaluations, they all agreed on certain issues: that Janezic suffers from one of the most severe mental illnesses known; that Janezic is psychotic; that her *711 psychosis is manifested by delusions; that her condition is incurable; and that her condition can be treated, but cannot be controlled without medication. Rinn testified that in his opinion, Janezic was insane, as that term is defined by Alabama law, when she killed Simon.

B. FACTS BEFORE THE TRIAL COURT ON THE ISSUE OF COMPETENCY
Throughout the prosecution of Janezic on the charge of Simon's murder, her competency was always at issue. After Janezic's arrest, the trial court granted defense counsel's request for a psychiatric examination to determine Janezic's competency to stand trial and ordered that Janezic be evaluated on an outpatient basis. The trial court granted the prosecution's motions to have Maier examine Janezic, in December 1993, February 1994, and March 1994. Rinn evaluated Janezic on at least three occasions as well.
In June 1994, the trial court held a jury trial on the issue of Janezic's competency to stand trial. At that trial, Rinn and Maier, the state's expert, were in substantial agreement on the issues of Janezic's mental illness and her insanity at the time of the offense, but not on the issue of Janezic's competency. They both testified that Janezic was not cooperating with her attorney, that Janezic refused to acknowledge that she was mentally ill, and that this denial is typical of those suffering from the same mental disease as Janezic. Both also concurred that this denial was hampering her defense, because she refused to assist her counsel in preparing a defense of not guilty by reason of insanity. However, they disagreed on whether her refusal to assist counsel sprung from her mental illness or from other factors. Rinn concluded that her denial of her mental illness was a symptom of her disease. Maier did not concur. Maier concluded that Janezic was able to consult with her attorney and to understand the proceedings, but that she did not appear to wish to do so. The jury returned a verdict that Janezic was competent at that time to stand trial.
Four months later, Maier testified at Janezic's trial as a witness for Janezic. At that time, he observed Janezic's demeanor and concluded that her condition had deteriorated since her competency trial in June 1994. After her conviction, and without the knowledge of either the trial court or counsel, Maier evaluated Janezic at the jail on November 14, 1994. Based on his observation of Janezic during the trial itself and on the post-trial evaluation, he concluded that Janezic had not been competent to stand trial. Maier made his findings known to defense counsel. Subsequently, Maier's conclusions were made known to the trial court on November 15. On the basis of Maier's testimony, the trial court held that Janezic was not competent to be sentenced, and remanded her to the custody of the Department of Mental Health and Mental Retardation for treatment. The trial court further ordered that it be apprised of Janezic's progress every 90 days, and that it be notified when she was restored to competency.
On July 6, 1995, the trial court held another competency hearing. Maier testified, as did Dr. Wilburn Rivenbark, a forensic psychologist employed by the State of Alabama. Testimony at this hearing revealed that Janezic's mental condition had deteriorated even more seriously. Although her condition had improved noticeably in response to regular, strong dosages of Mellaril (an antipsychotic drug), both experts agreed that no amount of medical treatment could restore her to a normal, rational mental state. They elaborated that during the period from August 1992 through November 1994a period including the commission of the offense and the trialJanezic received no medication for her mental illness. Both testified that this protracted period of deterioration resulted in permanent damage of such severity that Janezic could no longer be restored to a normal mental state. Nevertheless, Rivenbark testified that Janezic's competency had been restored. The trial court found Janezic competent to be sentenced.
Before sentencing Janezic to life imprisonment, the trial court acknowledged the severity of Janezic's mental illness, and the fact that the mental health system failed Janezic, stating, in part, as follows:

*712 "In the best of all possible worlds, someone would have recognized early on that [Janezic's] not eating and not drinking for an extended period of time was an act that constituted an overt act of danger to the person that is to be committed, and the best of all possible worlds those officials at the Huntsville-Madison County Mental Health Center who discharged Ms. Janezic from further treatment at her request prior to this crime would not have done so. In the best of all possible worlds, Judge Frank Johnson and the attorneys for the plaintiffs in White v. Stick would have been able 25 years ago to have looked forward to this day, to this courtroom, to this place, and to have understood that maybe there needed to be some laxity in the requirements of proof that were fashioned. But this is not the best of all possible worlds. It is what we are given. We are in it, but hopefully not of it."
After sentencing, Janezic filed a timely and sufficiently supported motion for a new trial, alleging that she had been incompetent to stand trial. The court held no hearing on this motion and allowed it to be denied by operation of law.

II. COMPETENCY
I dissent first because I believe that the evidence unequivocally shows that Janezic was incompetent at the time of her trial and thus the denial of Janezic's motion for a new trial by operation of law cannot stand.
The record shows that, in June 1994, a jury found that Janezic was competent to stand trial, as that term is defined by Rule 11.1, Ala.R.Crim.P., which states:
"A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant."
At that time, the experts agreed that Janezic was suffering from one of the most severe mental diseases known, that she was psychotic, and that at the time of the offense she was unable to appreciate the nature, quality, or wrongfulness of her act. However, at the competency hearing, the experts' opinions on the question of Janezic's competency to stand trial were conflicting. Maier testified that, in his opinion, Janezic was competent as of his most recent examination of her and that his opinion had not changed. Maier's testimony at that hearing was the only evidence to support the jury's finding that Janezic's was competent.
On October 26, 1994, approximately four months after she was found competent to stand trial and nine months after Maier's examination upon which he based his opinion that she was competent, Janezic was convicted of murder. On November 15, 1994, a hearing was conducted, initially for the purpose of sentencing Janezic. However, at that hearing, Maier came forward to testify that he now believed that Janezic was incompetent as defined by Rule 11.1. Specifically, he testified, as follows: "In light of everything I know and have thought and studied about Ms. Janezic, my opinion is now that she has deteriorated significantly since I saw her last in June." Maier based this opinion on his personal observations of Janezic at her trial and on his personal evaluation of Janezic in jail on November 14, 1994. He testified that during the trial, there appeared "to be marked disinterest and little awareness or concern about what was going on" on the part of Janezic. These observations prompted Maier to voluntarily evaluate her in jail on November 14, 1994, at which time he observed the following, as reflected by his testimony:
"[T]here was little appropriate responsiveness. Ms. Janezic, in my opinion is now quite actively psychotic or seriously mentally ill. Her touch with reality was fleeting at best. She could tell me her name, her birth date, her age, how long she had been in this place of confinement versus the jail in Decatur, but I could get very little else that made rational sense from her when I saw her yesterday [November 14, 1994]."
Maier's testimony at the hearing on November 15, 1994, reflected the only observation temporally relevant to the issue of Janezic's actual competency at the time of her trial. *713 Having heard Maier's updated evaluation, and on the basis of Maier's unchallenged testimony, the trial court adjudicated Janezic incompetent to be sentenced and remanded her to the custody of the Department of Mental Health. At a later hearing, Dr. Rivenbark testified that when Janezic arrived at Bryce Hospitalpursuant to the trial court's finding of incompetencyin November 1994 (within weeks of the trial), she was "overtly psychotic" and "unable to really perceive and respond to the world in what we call a rational and logical basis."
In Gothard v. State, 452 So.2d 889, 893 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala.1984), this court held:
"`[W]hen facts are present before the trial judge which create a reasonable and bona fide doubt as to the mental competency of the accused to stand trial, there is no question but that the trial judge must take steps to assure a reasonable legal determination of such questions.' Atwell v. State, 354 So.2d 30, 35 (Ala.Cr.App.1977), cert. denied, Ex parte Atwell, 354 So.2d 39 (Ala. 1978). Even where the issue of competency has not been raised by defense counsel, `[t]he trial judge has an ongoing and continuing responsibility to prevent the trial of an accused unable to assist in his defense.' Miles v. State, 408 So.2d 158, 162 (Ala.Cr.App.1981), cert. denied, Ex parte Miles, 408 So.2d 163 (Ala.1982)."
The only testimony in the record pertaining to the issue of Janezic's competency at trial points unequivocally to the conclusion that she was incompetent. The only evidence upon which the jury found Janezic competent in the June 1994 competency hearing was the testimony of Maier, who later unequivocally testified that Janezic's competency had dissolved by the time of her trial. The trial court's acceptance of Maier's conclusion, as indicated by its admission that Janezic was incompetent for sentencing, virtually negates any suggestion that Maier's postconviction testimony did not accurately reflect Janezic's demeanor at trial.
In view of this testimony, and the trial court's treatment thereof, I can see absolutely no evidence supporting the conclusion that Janezic was competent at the time of her trial. The record is devoid of any evidence even suggesting that Janezic's incompetency for sentencing was caused by any circumstance intervening between her trial and the court's finding of incompetency weeks later. Cf. Weihofen, Mental Disorder as a Criminal Defense, 434 (1954) (recognizing "the common-sense statement that after a person has been found to be sane at one given date, in order to prove that he is insane at a later date, it must be shown that his condition has changed in the meantime"). Here, there is no evidence that Janezic's condition changed between her trial and the court's adjudication. I am most impressed with Dr. Maier's urgency to come forward with new evidence on the issue of her competency to stand trial, i.e., evidence of her deterioration since he had arrived at his opinion of her competencythe only expert opinion to that effect and the sole evidence upon which the jury based its finding of competency. Such evidence should not be ignored by the majority.
Janezic raised this issue in a timely and properly supported motion for a new trial, filed after her sentencing. At that time, the evidence was compelling that Janezic was not competent during her trial, and the trial court had no objectively apparent reason to find otherwise. The trial court did not conduct a hearing on the motion for a new trial, and the motion was denied by operation of law. In Edgar v. State, 646 So.2d 683, 687 (Ala.1994), the Supreme Court held, as follows:
"[W]here, as here, a criminal defendant's motion for a new trial is denied [by operation of law,] under the provisions of Rule 24.4, Ala.R.Crim.P., without an affirmative statement by the trial judge giving the ruling a presumption of correctness and the defendant supports his new trial motion by evidence that was not presented at trial, and that evidence, if not controverted by the state, will entitle him to a new trial, the denial by operation of law should be reversed and the case remanded for the trial court to conduct a hearing on his motion for a new trial and then enter an order either granting or denying the motion."
*714 I can see no reason to construe the trial court's affirmative duty to guard against the conviction of an incompetent as terminating at the conclusion of the trial.[6] Thus, when evidence that so plainly points to a defendant's incompetence at trial is not received until after the verdict, I believe the trial court's continuing duty demands that it grant a new trial, especially when a timely and sufficient motion has been filed by the defendant. Clearly, the unchallenged testimony of Janezic's incompetence at the time of her trial, the trial court's acceptance of Maier's conclusions, and the post-conviction adjudication of Janezic as incompetent compels the conclusion that the denial by operation of law of Janezic's motion for a new trial was an abuse of the trial court's discretion and a blatant disregard of Janezic's right to receive a fair trial. At the very least, Janezic is entitled to a remand by this court for the trial court to adjudicate the merits of Janezic's motion for a new trial.

III. SANITY
Notwithstanding what I perceive to be an erroneous denial of Janezic's motion for a new trial, I believe the law mandates much more extensive relief in this case than the remand prescribed by Edgar: Janezic's conviction should be reversed and the cause remanded for the entry of a judgment of not guilty by reason of insanity. The evidence directly showing that Janezic was insane at the time of the offense was overwhelming. Moreover, the only rational conclusion to be drawn from the evidence as a whole is that the evidence of Janezic's insanity was uncontradicted and unimpeached. No evidence or inference therefrom logically points to her sanity at the time of the offense. The majority's cursory analysis fails to consider the details of this case in the context of the evidence as a whole. I would reverse Janezic's conviction and remand this case with instructions for the trial court to proceed with commitment proceedings pursuant to §§ 15-16-41 et seq., Code of Alabama 1975. If the insanity defense is to have any meaning at all in Alabama, it is established by the facts of this case.
Alabama's insanity defense is codified at § 13A-3-1(a), which reads in pertinent part as follows:
"It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease of defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."
The general principles of law regarding the insanity defense were collected in Herbert v. State, 357 So.2d 683, 688-89 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala.1978), and were carried over to the current formulation of the insanity defense in Dixon v. State, 668 So.2d 65 (Ala.Cr.App.1994).
"`Those principles may be summarized as follows:
"`1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
"`2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
"`3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury. [Now, under Ala.Code § 13A-3-1(c), "[t]he defendant has the burden of proving the insanity defense by clear and convincing evidence."]
"`4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
"`5. In making its determination, the jury may reject all expert testimony though it is without conflict.

*715 "`6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored.
"`....
"`The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
"`"Cases of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form." Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934).'

"Herbert v. State, 357 So.2d 683, 688-89 (Ala.Cr.App.[1978]) (bracketed material added [in Dixon])."
Dixon, 668 So.2d at 69-70.
My research reveals nine cases in which this court upheld the jury's guilty verdict in the face of strong, although not overwhelming, evidence that the defendant was insane at the time of the offense: West v. State, 586 So.2d 999 (Ala.Cr.App.1991); Bass v. State, 585 So.2d 225 (Ala.Cr.App.1991), overruled on other ground, Trawick v. State, 698 So.2d 151 (Ala.Cr.App.1995); Ware v. State, 584 So.2d 939 (Ala.Cr.App.1991); Ellis v. State, 570 So.2d 744 (Ala.Cr.App.1990); Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated on other ground, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); Westbrooks v. State, 492 So.2d 1023 (Ala.Cr.App.1984); Sistrunk v. State, 455 So.2d 287 (Ala.Cr.App.1984); Cunningham v. State, 426 So.2d 484 (Ala.Cr. App.1982); and Bowen v. State, 386 So.2d 489 (Ala.Cr.App.), cert. denied, 386 So.2d 492 (Ala.1980). In contrast, our appellate courts have reversed judgments in the following cases, holding that the jury's guilty verdict was contrary to the overwhelming and uncontradicted evidence that the defendant was insane at the time of the offense: Ex parte Turner, 455 So.2d 910 (Ala.1984); Christian v. State, 351 So.2d 623 (Ala.1977); Dixon v. State, 668 So.2d 65 (Ala.Cr.App.1994); Clark v. State, 475 So.2d 657 (Ala.Cr.App.1985); Smith v. State, 411 So.2d 839 (Ala.Cr.App. 1981); Sasser v. State, 387 So.2d 237 (Ala.Cr. App.), cert. denied, 387 So.2d 244 (Ala.) (by the appellant), and 387 So.2d 244 (Ala.1980) (by the state), cert. denied, 450 U.S. 924, 101 S.Ct. 1376, 67 L.Ed.2d 353 (1981); Woods v. State, 364 So.2d 1178 (Ala.Cr.App.), cert. denied, 364 So.2d 1186 (Ala.1978); Herbert v. State, 357 So.2d 683 (Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala.1978); Pickett v. State, 37 Ala.App. 410, 71 So.2d 102 (1953), cert. denied, 260 Ala. 699, 71 So.2d 107 (1954).
The majority attempts to distinguish several cases in which our appellate courts have held that the jury's rejection of the insanity defense was improper. However, its attempt is specious. The majority correctly notes that most of those cases were decided under a prior formulation of Alabama's insanity defense, which established for the defendant a lower burden of proving insanity at trial than is required by the current law. However, this court's standard of review for analyzing the evidence of insanity has not changed: we may reverse the judgment imposed pursuant to the jury's verdict only "in those cases where the proof of insanity is overwhelming and uncontradicted." Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934).
The law regarding a jury's use of expert testimony in cases involving an insanity defense was thoroughly discussed in Ellis, supra. The gravamen of those legal principles is expressed in the following passage: "`The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony.'" Ellis, 570 So.2d at 752 (quoting United States v. Hall, 583 F.2d 1288, 1294 (5th Cir.1978) (footnotes omitted)). In Alabama, the jury's rejection of expert testimony in cases involving the insanity defense has been held to be reasonable in several cases: where the expert witnesses did not specifically testify that the defendant was legally insane at the time of the offense (see Bass, Ware, Ellis, Bui, Westbrooks, Cunningham); where there was conflicting expert testimony (see West, Bui, Bowen), or where the expert testimony was rebutted by lay testimony (see Ellis); where the experts' conclusions were based only on brief observations and limited data (see Bui), or only on post-arrest observations (see Cunningham); and where the defendant testified at trial, *716 thereby allowing the jury to observe the defendant's demeanor and independently determine his mental state (see Sistrunk).
The majority exhaustively parrots Cunningham and portrays the facts of that case as controlling its holding today that the jury's rejection of the expert testimony in Janezic's trial was reasonable. The facts in Cunningham, however, are clearly distinguishable in several material respects from the facts now presented. First, as noted above, the experts in Cunningham did not testify as to the ultimate issue of the appellant's insanity. In this case, both the defense expert and the court-appointed expert specifically testified that Janezic was insane at the time of the offense. Second, the experts in Cunningham based their opinions exclusively on observations of the defendant after the offense. In this case, five expert witnesses had examined Janezic before she killed Simon. Each of them agreed as to the severity of Janezic's mental illness. Significantly, one of those who had examined Janezic before the crime was subsequently appointed by the court at the prosecution's request to evaluate Janezic in preparation for trial. He testified that Janezic was insane at the time of the offense. See Cunningham, 426 So.2d at 491 ("The opportunity for study and observation of the person whose sanity is questioned are important factors the jury should consider in evaluating the weight to be accorded an expert's opinion."). Third, the jury in Cunningham observed the defendant testify at trial. The jury in this case had no similar opportunity. Finally, we note that the majority incorrectly characterizes the evidence presented in Cunningham as follows: "In Cunningham, experts testified that the manner in which the crime was conducted, the flight from the scene of the crime, and the fact that the motive for the crime was revenge, negated the insanity defense." The court in Cunningham made no such statement. In fact, the court observed that the defendant's conduct and demeanor immediately after the crime were not inconsistent with insanity. Id. at 491.
In this case, unlike the above cases, the jury had no objective reason within the totality of the evidence to reject the experts' opinions of Janezic's insanity. The defense presented two highly credible expert witnesses, who each specifically testified that, at the time she committed the crime, Janezic was insane as defined by § 13A-3-1. The fact that four of Janezic's expert witnesses stated no opinion as to Janezic's state of mind on the day of the murder did not present a conflict in the testimony regarding Janezic's mental state at the time of the crime. According to the evidence presented at trial, every psychologist or psychiatrist who had ever examined Janezic had concluded that she suffers from one of the most severe mental diseases known and that she is dangerously unstable without medication. The whole of these experts' opinions was based upon years of observations of Janezic throughout her treatment as a mental patient, and also on observations, tests, and interviews conducted after her arrest.
Substantial lay testimony was also offered and was based upon observations of Janezic throughout her life. As noted above, these lay witnesses included a judge who had previously adjudicated Janezic to be mentally ill based on clear and convincing evidence, and several attorneys who had previously represented Janezic in civil proceedings involving her competency and her sanity. Every lay witness, including those offered by the state, corroborated the experts' conclusion that at the time Janezic committed the murder, she was legally insane.[7] Finally, because Janezic did not testify, the jury did not have an opportunity to observe her and reach an independent conclusion regarding her mental state. Moreover, as shown above, her demeanor at trial was inconsistent with that of a person possessed of a sound mind. Thus, the evidence provides no objective reason recognized in Alabama case law upon which the jury could have properly rejected the expert testimony.
However, in holding that the jury's rejection of the expert testimony was not arbitrary, *717 the majority relies substantially on the following principle:
"`[W]here the whole evidence does not satisfy the minds of the jury that the accused is insane at the time of the commission of the crime with which he is charged, the jury should convict the defendant, notwithstanding that the medical witnesses were of the opinion that such person was insane.' 31 Am.Jur.2d Expert and Opinion Evidence, Section 186 (1967). The very manner in which the crime was planned, executed or concealed may indicate such a consciousness of guilt and awareness of criminality that the question of sanity was for the jury even though all the expert defense testimony concluded that the defendant was insane. Boyle [v. State], 229 Ala. [212] at 224, 154 So. 575 [ (1934) ]."
723 So.2d at 701 (quoting Cunningham, 426 So.2d at 490). See, e.g., Bass, Ware, Sistrunk. The majority concludes that the jury could have inferred that Janezic was sane at the time of the offense from the following facts: (1) Janezic left the crime scene after shooting the victim and it appears that she wore a wig when she shot the victim; (2) the killing was apparently planned; (3) the jury observed Janezic sit mute and withdrawn at the defense table throughout the trial; and (4) Janezic had as a motive revenge for victim's refusal to testify at her child custody hearing in September 1989. Aware of the appellate court's limitations in reviewing a jury's verdict, I address in turn each of these factors that the majority concludes to be circumstantial evidence of Janezic's sanity.

A. FLIGHT AND CONCEALMENT
Evidence of flight and evidence of concealment are admissible because each is in effect an admission by conduct; as such, they are governed by the same principles of law. See 2 Wigmore on Evidence, § 276 (Chadbourn rev.1979); S. Gard, 2 Jones on Evidence, § 13:47 (1972). See, e.g., Ex parte Jones, 541 So.2d 1052 (Ala.1989). See also C. Gamble, McElroy's Alabama Evidence § 190.01(1) (5th ed.1996) (the term "flight" may include the concealment of identity). As a general rule, evidence of a defendant's flight is presumed to indicate the defendant's consciousness of guilt. See generally Ex parte Jones. Whether evidence of flight is probative of this issue depends, of course, on the facts of the case.
"[The] probative value [of flight] as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."
United States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977), cert. denied, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). See also C. Gamble, supra, at § 190.01(1) (recognizing the use of the test of United States v. Myers).
However, the admissibility of flight as evidence of guilt has been tempered by the general recognition of "the inherent unreliability of evidence of flight." Id., at 1051.
"The evidentiary value of flight ... has depreciated substantially in the face of Supreme Court decisions delineating the dangers inherent in unperceptive reliance upon flight as an indicium of guilt. We no longer hold tenable the notion that `the wicked flee when no man pursueth, but the righteous are as bold as a lion.' [Alberty v. United States, 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051, 1056 (1896) ] The proposition that `one who flees shortly after a criminal act is committed or when he is accused of committing it does so because he feels some guilt concerning that act' [Miller v. United States, 320 F.2d 767, 770 (D.C.Cir.1963) ] is not absolute as a legal doctrine...."
Bailey v. United States, 416 F.2d 1110, 1115 (D.C.Cir.1969)
In perfunctorily concluding that Janezic's behavior after the crime constitutes evidence of flight "as the law contemplates," not only does the majority disregard the recognized general inherent unreliability of proposed evidence of flight, but it also offers no rationale from which one can glean that it considered the threshold hurdle necessary to find legitimate *718 probative value in the proposed evidence of flight: "from the defendant's behavior to flight." 550 F.2d at 1049. I believe that the evidence construed by the majority as evidence of flight does not support such an inference. The authority with which the majority pronounces its conclusion that Janezic's behavior constitutes evidence of flight belies the scant evidence upon which that conclusion is based. In Johnson v. State, 553 So.2d 645, 646 (Ala.Cr.App.1989), this court observed as follows:
"[E]vidence that the accused left the scene of the crime immediately after its commission is not, in itself, evidence of flight. As was noted in Beverett v. State, 24 Ala.App. 470, 471, 136 So. 843 (1931), `The testimony of several witnesses, to the effect that immediately after inflicting the mortal knife blows upon deceased that defendant ran from the place of killing, cannot be construed as attempting to show flight as the law contemplates.' But see Holland v. State, 49 Ala.App. 104, 106, 268 So.2d 883 (1972) (evidence that immediately after shooting, defendant and his companion were `intercepted' at or near a cemetery some two or three miles from the place of the shooting and that the automobile driven by the defendant had collided with another automobile in a funeral procession was admissible as `tend[ing] to show flight on the part of the appellant from the scene of the difficulty').
"`However, under certain circumstances, the fact that the accused made a hurried departure from the scene of the crime immediately after the crime was committed may constitute evidence of flight.' Rowser v. State, 346 So.2d 533, 535 (Ala. Cr.App.1977), cert. denied, 346 So.2d 536 (1977). `This will be true especially where the evidence shows that the accused ... left the county or jurisdiction immediately after the commission of the crime.' Rowser, 346 So.2d at 535."
The only evidence to support the majority's conclusion that Janezic fled is that she was not with Simon when his wife discovered him shot and that shortly thereafter, Janezic was seen nearby running or jogging away from the church. However, her conduct in the week following the murder weighs against the conclusion that her behavior immediately after the crime constitutes evidence of flight, as the law contemplates. As recounted above, she remained in Huntsville for a week after the murder. During that period, in spite of a highly publicized manhunt for Simon's murderer, Janezic went about her business in a manner thoroughly inconsistent with that of a fugitive in flight: she went out dancing and drinking, she initiated a romance, she drove by Simon's church on more than one occasion, she expressed curiosity regarding the commotion surrounding Simon's wake, she dated, and she attempted to renew her license tag in person. On the day she was arrested, Janezic had travelled to the neighboring town where, without cause, provocation, planning, or concealment, she shot and wounded a total stranger. She did not flee after that assault; she remained at the scene and was ultimately convinced to surrender. Thus, the inference"from the defendant's behavior to flight," 550 F.2d at 1049is not supported by the evidence when considered in its entirety. Compare Cunningham, 426 So.2d at 490 ("[a]lmost immediately after the stabbing the defendant `took off' and tried to flee when he spotted the police").
Likewise, the fact that Janezic appears to have been wearing a reddish-brown wig when she shot Simon should be viewed in light of the fact that she did not care enough to wear this alleged disguise convincingly (it was crooked and did not conceal her blond bangs) or to even ensure that she was wearing the wig when leaving the scene. Taking these facts together, they fail to support the threshold inference necessary to establish the probative value of the proposed disguise evidencefrom the defendant's behavior to disguise, as contemplated by the law. Cf. United States v. Myers.
Even assuming, arguendo, that the facts in this case rationally warrant the application of the chain of inferences in United States v. Myers, logic would extend no further from that evidence of flight and disguise than to the general inherently unreliable conclusion that Janezic was conscious of her guilt. It is here that the majority also falters: it discusses *719 the evidence of flight only as probative of consciousness of guilt. Yet when the insanity defense is injected into a trial, a defendant's knowledge of the wrongfulness of his or her conduct is not dispositive of the ultimate issue. Instead, the inquiry turns on the defendant's ability to appreciate the wrongfulness of the act. § 13A-3-1(a). Compare United States v. Myers, 550 F.2d at 1049 (discussing flight as evidence only of "consciousness of guilt") (emphasis added), with United States v. Freeman, 357 F.2d 606, 623 (2d Cir.1966) (holding that when insanity is at issue, "mere intellectual awareness that the conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance").
"`The fact that the defendant ... exhibited a sense of guilt as by concealment or flight, is often taken as conclusive evidence that he knew the wrongfulness of his behavior. Yet one of the most striking facts about the abnormality of many psychotics is that their way of knowing is entirely different from that of the ordinary person. In psychiatric terms, their knowledge is usually divorced from all effect, which is to say that it is like the knowledge children have of propositions they can state but cannot understand; it has no depth and is divorced from comprehension.... It seems clear that the knowledge that should be deemed material in testing responsibility is more than merely surface intellection; it is the appreciation sane men have of what it is that they are doing and of its legal and moral quality.'"
State v. Smith, 223 Kan. 203, 574 P.2d 548, 554-55 (1977) (Prager, J., dissenting) (quoting the April 1968 issue of the Kansas Judicial Council Bulletin). See generally, Robinson, 2 Criminal Law Defenses, § 173(d)(3) (1984) (interpreting the "use of the phrase `appreciate criminality [or wrongfulness]' rather than `know criminality [or wrongfulness]'"). In this regard, this court has recognized that
"`"[a] person's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law is not the same as his ability to know right from wrong.... A person may indeed know that doing the act that constitutes a capital offense is wrong and still not appreciate its wrongfulness because he does not fully comprehend or is not fully sensible to what he is doing or how wrong it is."'"
Ivery v. State, 686 So.2d 495, 502 (Ala.Cr. App.1996) (quoting jury instructions approved of in Brown v. State, 686 So.2d 385, 402 (Ala.Cr.App.1995)), aff'd, 686 So.2d 409 (Ala.1996). Thus, whereas evidence of flight often sheds dim light on a defendant's consciousness of guilt, it is even less illuminative of a defendant's ability to appreciate the wrongfulness of his or her conduct.[8]
I recognize that under the appropriate circumstances, a jury may consider evidence of flight in determining a defendant's sanity. See State v. Ramseur, 106 N.J. 123, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). However, other jurisdictions have recognized that in some cases, a severe mental illness can render the inferences from flight to guilty conscience unreliable, i.e., the presumption that flight indicates a guilty conscience. For example, in State v. Milian-Hernandez, 287 S.C. 183, 336 S.E.2d 476 (1985), the appellant was a paranoid schizophrenic. Having expressed his belief that he was being followed by Cubans who intended to harm him, the appellant set out on a circuitous, cross-county bus trip. During his journey, the appellant encountered a series of Spanish-speaking passengers and he grew increasingly agitated. Ultimately, the appellant shot two of the bus passengers and fled into the woods. Reversing his conviction, the South Carolina Supreme Court held, as follows: "This Court has long held that evidence of flight is evidence of guilty knowledge from which a jury may infer sanity. We adhere to this view; however, the circumstances of this Appellant's flight are such as to negate that permissible inference." Id. 336 S.E.2d at 477 (citations omitted). It stands to reason that *720 if the inferences from flight to guilty conscious are unreliable, then the longer chain of inferences from flight to sanity (i.e., the defendant's ability to appreciate the wrongfulness of his or her act) is less reliable.
In harmony with the principles discussed above, this court has found on at least three occasions that the evidence overwhelmingly supported a defendant's insanity defense, despite evidence showing that the defendant left or fled the crime scene. In Clark, supra, the appellant, a paranoid schizophrenic, carried two pistols with him to the barbershop where he had been a customer for several months. He entered the barbershop, and, without warning, withdrew the pistols from his pockets and shot his barber in the arm and side. The appellant then turned and "walked out of the shop, threw his pistols in his car and drove off." Id. at 658. Notably, this court did not interpret the fact that the appellant left or fled to be in any way probative of sanity. On the contrary, this court held that the appellant's "actions were so bizarre, unprovoked, and without a rational basis that there was no evidence from which the jury could reasonably infer that he was sane when the shooting occurred." 475 So.2d at 659 (emphasis added).
In Sasser, supra, the appellant was a bipolar psychotic, manic type, he sought refuge in the room of a guest at a local motel, a few hours before the offense, claiming that the police were "after him." 387 So.2d at 238. Immediately thereafter, a sheriff's deputy arrived with a warrant for the appellant's arrest, but was turned away by the motel guest. Four hours later, the appellant was seen standing in the median of the highway in front of the motel, brandishing a rifle and aiming it down the highway. The deputy promptly arrived, whereupon the appellant shot at the patrol car. The bullet pierced the car door and lodged in the deputy's leg. The deputy instructed the appellant to surrender but received no response. The appellant then ran into a nearby restaurant. As the police advanced with their sirens wailing, the appellant stole a truck and led the police on a high-speed chase. The police pursued the appellant, shooting at the truck. Ultimately, the appellant crashed the truck and was arrested. This court concluded, even in light of the appellant's flight, which led at least two marked patrol cars on a dangerous high-speed chase, that the record contained "no evidence by which the testimony of two unimpeached and unimpeachable experts, to the effect that [the appellant] was insane at the time of the alleged crime, may be disparaged." Id. at 243 (emphasis added).
In Woods, supra, the appellant had no history of mental disease before he committed the murder with which he was charged. After his arrest for the murder, however, he was diagnosed as a paranoid schizophrenic. On the day of the murder, the appellant had been chasing and threatening several neighborhood children. He ultimately caught and stabbed one of the children in her own home. He wiped the blood off of the knife and ran out of the house and down the road. When the police found him, he was still running down the road, "hollering that he was the one that killed the little girl." 364 So.2d at 1180. This court declined to construe the fact that the appellant left or fled the crime scene as indicating sanity or a guilty conscience, and reversed the conviction, holding that the jury had arbitrarily ignored the expert testimony as to the appellant's insanity.
In this case, could the jury have properly concluded with any "degree of confidence,"[9], from the facts that Janezic wore a wig to the crime scene and that she left the crime scene, that she was able to appreciate the wrongfulness of her conduct? Apparently the trial court did not think so, as indicated by its failure to instruct the jury on the permissible inferences or presumption from evidence of flight and disguise. As stated above, her conduct immediately after the murder does not justify characterizing her departure as flight, especially in light of her conduct in the days following the murder. Moreover, the particular circumstances of this case, including Janezic's severe mental illness and paranoid delusions,[10] render utterly *721 unreliable any inference or presumption drawn from her departure and alleged disguise to her allegedly guilty conscience and then from that to her sanity (i.e., that she had the ability to appreciate the wrongfulness of her act). In this case, as in Clark, Sasser, and Woods, the vague circumstances of Janezic's alleged flight and concealment provide no support for the conclusion that Janezic was sane at the time she killed Simon.

B. PLANNING
The majority concludes, relying on Cunningham v. State, 426 So.2d 484 (Ala.Cr.App. 1982), that Janezic's sanity may be inferred from evidence showing that she planned Simon's murder.[11] However, the majority's conclusion fails to properly apply the principles in Cunningham to the facts of this case, and the record shows that the majority's conclusion is thus in error.
This court has held that sanity may be inferred from "[t]he very manner in which the crime was planned, executed or concealed." Cunningham, 426 So.2d at 490 (emphasis added). This principle is based on the presumption that if a crime is planned in a rational manner, then it was planned by a rational mind. The facts in this case regarding the manner in which Janezic may have planned the murder are sketchy at best. She purchased a gun on June 18, 1993. In the course of purchasing the gun, she lied in stating that she had no history of mental illness. Testimony revealed that such a denial is symptomatic of paranoia schizophrenia. During the month before the murder, she habitually stood on the street corner near Simon's church and watched the traffic in so odd a manner as to invoke attention of a stranger. On the afternoon of August 28, 1993, she put on a wig in such a fashion that it was crooked and failed to conceal her bangs, and was seen searching through her car in so frantic a manner as to call attention to herself. One witness who observed Janezic searching her car testified, "She was just odd. It was odd." Shortly after Janezic was seen rummaging through her car, she drove to the church, where she shot Simon in broad daylight. She then either lost or discarded the wig, indicating her disinterest in or her unawareness to any disguise, and she ran or jogged away, apparently leaving her car in the church parking lot. Evidence indicating the manner in which Janezic planned this crime is inconclusive at best, and nothing about the manner in which this crime was planned, executed, or concealed indicates a rational mind. In my opinion, it suggests the contrary: that her actions, upon which the majority depends, sprung from an insane mind, not a rational mind.

C. JANEZIC'S DEMEANOR AT TRIAL
The majority concludes that the jury's observation of Janezic's demeanor during the trial provides an objective basis for the rejection of the overwhelming expert testimony pointing to her insanity. Janezic did not testify.
Our appellate courts have never held that the jury's observation of a nontestifying defendant provides an objective basis for the jury to reject unequivocal and unimpeached expert testimony of a defendant's insanity. Sistrunk, 455 So.2d at 290 (quoting Stewart v. United States, 366 U.S. 1, 6 n. 13, 81 S.Ct. 941, 944 n. 13, 6 L.Ed.2d 84 (1961)) (emphasis added) ("`[t]he conduct of a witness on the stand is, of course, a form of testimony; his demeanor is always in evidence when he is testifying.'")[12] Such a holding would, in effect, *722 be saying that the jury and this court could properly reject all evidence of insanity under all circumstances on the mere presence of a defendant at trial, thus presenting defendants like Janezic with a Hobson's choice between pursuing an insanity defense and the fundamental constitutional right to be present at trial. In Turner, Christian, Dixon, Clark, Smith, Sasser, Woods, Herbert, and Pickett, each defendant was present at trial, and each jury had the same limited opportunity to observe as did the jury in Janezic's trial. However, each of those convictions was reversed as contrary to overwhelming and uncontradicted evidence that the defendant was insane at the time of the offense.
Moreover, the majority's blithe conjecturethat Janezic's demeanor at trial supports the jury's verdict rejecting Janezic's insanity defenseis flatly refuted by testimony received at the post-conviction competency hearing. At that hearing, Dr. Maier testified as to his observations of Janezic's demeanor during the course of her trial. He testified that she displayed "little awareness or concern about what was going on." He further stated that she was withdrawn and did not communicate with her attorneys or assist them in her defense. His observations compelled him to again evaluate Janezic for competency. Maier concluded, based on his personal observations at trial and his subsequent evaluation of her, that Janezic's condition had severely deteriorated by the time of her trial, and that her demeanor at trial exhibited overt psychosis. Based on Maier's testimony, the trial court adjudicated Janezic incompetent for sentencing, and postponed her sentencing until her condition could be stabilized. Further post-trial testimony suggested that Janezic may have plugged her ears with plastic during her trial. Nothing in the record refutes Maier's conclusion that Janezic's demeanor at trial was overtly psychotic and illustrative of her incompetence to stand trial. Without exception, all evidence in the record expressly contradicts the majority's blind conclusion that Janezic's demeanor at trial supports the jury's verdict.

D. MOTIVE
The majority believes that the evidence supports the conclusion that Janezic's motive for killing Simon was revengehe had refused to testify in her child custody case and that this motive constitutes circumstantial evidence of Janezic's sanity at the time of the killing, sufficiently probative to legitimately reject the overwhelming expert testimony.
"Motive is herein used in the sense of a feeling, passion, desire, impulse, wish, or the like, in a person that impels or inclines the person to do or not to do a particular act. Probably the best definition for the term comes in an Alabama decision [Harden v. State, 211 Ala. 656, 658, 101 So. 442, 444 (1924) ] in which the court distinguished motive and intent thusly: `Motive and intent are involved in homicide cases. These are not the same in law. "Intent" is the ripened purpose to effect a result; while "motive" is the moving power which leads the mind to desire the result and form the purpose.'"

C. Gamble, supra, at § 45.01(2) (emphasis added).
I believe that in determining the probative value of evidence of a defendant's motive, the mental state of the defendant at the time the motive was formulated must be considered. If the motive arose at a time when the defendant was severely mentally ill, as in this case, then reasonably the motive evidence can have no probative value as tending to show that the defendant was sane at the time of her act pursuant to that motive (i.e., that she was able to appreciate the wrongfulness of her act).
The only evidence of any hostility on Janezic's part toward the victim for his refusal to testify was Mrs. Simon's testimony that Janezic told her by telephone that she was very angry with Rev. Simon, and that Mrs. Simon would have to testify on Janezic's behalf. This testimony must be construed in light of the uncontroverted evidence showing that at the time of her child custody proceeding, Janezic was severely mentally ill. In fact, the custody proceeding was the direct and immediate result of her mental illness. Further, less than two months after the custody *723 hearing, Janezic was involuntarily committed to the custody of the Department of Mental Health and Mental Retardation, i.e., was found by clear and convincing evidence to pose a substantial threat of immediate harm to herself or to others because of her severe mental disease. As with the presumption of sanity allegedly arising from evidence of flight and planning, the leap from motive to sanity in this case is too inherently unreliable to have any probative value. A motive formulated when a defendant is severely mentally ill cannot, by reasonable inference, indicate that at the time the defendant supposedly acted on this motive he or she was sane. It cannot be a fair application of law to infer a sane mind from "a feeling, passion, desire, impulse, wish, or the like" springing from a severely mentally ill mind.
Assuming, arguendo, that the proposed motive was a product of a sane mind, I further believe that the probative value of the motive evidence is severely diminished by the remoteness of that evidence. The child custody hearing took place in September 1989, and she did not kill Rev. Simon until August 1993. "[I]t generally is held that the lapse of time goes to the weight of the evidence rather than to its admissibility." C. Gamble, supra, at § 45.01(4). While the elapse of time is not inordinate in this case, it must be considered in the probative weight to be given this evidence.
Moreover, "[r]emoteness has regard also to factors and considerations other than mere lapse of time." Smitherman v. State, 33 Ala.App. 316, 318, 33 So.2d 396, 398 (1948). In considering the weight of the motive evidence, the victim's daughter-in-law's testimony that the victim and Janezic engaged in a peaceful and calm conversation at sometime after the custody hearing must also be considered. This conversation hardly demonstrates hostility against the victim for not testifying. Rather, it shows evidence of the dissipation of the alleged motive, and without evidence of intervening ill will, it is illogical to speculate that the initial motive subsequently reasserted itself and caused the crime. A "friendly feeling" at a time prior to the time of the act in question is "evidential of its existence at the time in issue," although there is a question as to "how far it is thus evidentially available." 2 Wigmore, § 395. I find, however, that if the evidentiary value of the prior "friendly feeling" is seriously questioned, then also is the evidentiary value of the proposed motive. See id. ("The peculiar opportunity for error is that the prior emotion may have been brought to an end before the time in issue."). In making this assertion, I revisit by analogy the following passage: "`It seems clear that the knowledge that should be deemed material in testing responsibility is more than merely surface intellection; it is the appreciation sane men have of what it is that they are doing and of its legal and moral quality.'" State v. Smith, 574 P.2d at 555 (quoting the April 1968 issue of the Kansas Judicial Council Bulletin). If the majority is intent on giving any probative value to the motive evidence, my argument would be that Janezic's "friendly feeling" towards the victim subsequent to the alleged formulation of the revenge motive indicates only a "surface intellection" of the proposed motive.
Finally, a paranoid schizophrenic, by the very nature of that mental disease will have motive, irrational though that motive may be. If motive is per se evidence of sanity, as the majority essentially holds, then in all cases where the insanity defense is based on paranoid schizophrenia, the evidence of insanity will, as a matter of law, always be less than overwhelming. This apparent holding by the majority constitutes an unbearable shifting of the burden of proof that is both unconscionable and unconstitutional.

E. CONCLUSION
This is a sad case that has troubled me greatly. A good man was murdered without reason. However, we are judgesnot prison wardens. Our fealty is to stare decisis and the Alabama Constitution and the United States Constitution. "Clearly the sole question in this connection was whether defendant was `not guilty by reason of insanity,'" and "[w]hat might happen if [s]he were sent to the insane asylum, instead of the penitentiary, should not [be] thrown into the case." Boyle, 229 Ala. at 225-26, 154 So. at 587.
*724 All testimony regarding Janezic's mental illness was consistent and compelling. This testimony was elicited from psychologists, psychiatrists, a judge, attorneys, and others, each of whom had personal associations with Janezic during the past decade. The record shows that from 1989 to 1995, she was evaluated by mental health professionals on a regular basis. With each evaluation (excepting the anomalous and brief period during which she was medicated), her condition proved to have dramatically degenerated. In 1989 she was first diagnosed as having a major mental illness. As a result, she lost custody of her children and was involuntarily committed to the custody of the Department of Mental Health and Mental Retardation. After a brief period of successful treatment in 1992, she unilaterally terminated her medication against the better judgment of the medical experts. In 1993, after a full year without any medical attention, she killed Simon. During the first year and a half of her incarcerationalso a period in which she was not medicatedshe acted in a bizarre manner and grew more ill as a result of the medical neglect. Maier's observations of Janezic at trial show that by October 1994, as a result of her intensifying illness, Janezic was not even able to assist in her defense at trial. All expert testimony on the ultimate issue of insanity supported her defense, and there was no expert evidence in rebuttal.
I have thoroughly reviewed the circumstances of Simon's murder for any factors that might suggest that Janezic was sane at the time of the offense. The evidence purportedly constituting evidence of flight does not factually constitute "flight," as contemplated by the law, so as to support any presumption. Even if otherwise, the inferences gleaned from flight evidence would extend no further than "consciousness of guilt"; however, the ultimate issue in an insanity defense case is "the ability to appreciate the wrongfulness of the act." Moreover, the chain of inferences from flight to sanity is especially inherently unreliable. The evidence of Janezic's planning the murder also cannot be considered as probative, merely on its face, of the ultimate inquiry of sanity: the analysis of such evidence requires the further inquiry, ignored by the majority, of whether the evidence of the manner in which Janezic planned the crime indicates that it sprung from a rational mind. The evidence supports only one logical conclusion: her actions sprung from an insane mind. Moreover, all intentional murders have planning, whether it be merely picking up a knife or buying a gun. Neither can the evidence of insanity be overcome by Janezic's demeanor at trial. The Alabama appellate courts have never held that the jury's observation of a non-testifying defendant can be so considered, but even more compelling is the unrefutable conclusion, supported by Maier's testimony, that Janezic's demeanor at trial overtly indicated a severely mentally diseased mind. Finally, the proposed motive fails to overcome the overwhelming evidence of insanity because the evidence is without dispute that the motive was formulated when Janezic was severely mentally ill, which in my opinion completely negates any probative value of the evidence as showing a sane mind. Moreover, Janezic's subsequent expression of good will towards Simon severely diminishes any probative value of the proposed motive. In essence the majority relies on the cursory observation that the evidence generically indicates flight, planning, and motive, and on the conclusion that any evidence of flight, motive, and planning per se provides sufficient circumstantial evidence to impeach and contradict the overwhelming evidence of insanity. It fails to analyze whether the proposed conduct by Janezic allegedly indicative of flight, planning, and motive actually arose from a sane mind or an insane mind. See Dixon, 668 So.2d at 72 (in regard to the appellant's statement during her assault of a police officer"I've got you now Bitch."the court stated, "While the appellant's statement was plainly indicative of her intent to assault Officer Williams, it was also clearly consistent with the evidence that the appellant was suffering from a delusion that the assault was necessary to ensure the appellant's safety.").
The evidence urged by the majority is based either upon a incomplete analysis of the facts, upon an incorrect analysis of the facts, or upon impermissible inferences. Yet the majority insists that that evidence is *725 unquestionably sufficient to weaken the compelling probative force of the following: the wealth of expert opinion evidence; the prior judicial finding of Janezic's inability to care for her children, based on the evidence of her mental illness; the prior judicial finding of probable cause to believe that Janezic was mentally ill; the prior adjudication of mental incompetency for involuntary commitment, specifically the finding of clear and convincing evidence that Janezic was mentally ill; numerous attorneys' opinions that Janezic was insane; and other facts tending to prove her insanity.
Would the majority conclude that the evidence of Janezic's insanity was overwhelming if she had waited at the crime scene to be arrested, had proven that the murder was no more planned than any other intentional murder, and had waived her right to be present at trial? The overwhelming evidence at trial clearly and unequivocally points to the conclusion that Janezic was insane at the time of the offense. The evidence of Janezic's insanity was "so clear, the proof so strong and undisputed, that the jury should [have been] instructed in like form." 154 So. at 583. The senseless death of Rev. Simon was the final confirming evidence of Janezic's insanity when considered in the context of the matters discussed above.
This court has today raised the standard of review in insanity cases to a height that no defendant can possibly reach. The undeniable effect of the majority's decision is that a jury's rejection of the insanity defense is no longer reviewable in Alabama. The majority's opinion thus stands in conflict with previous decisions by this court, see, e.g., Dixon, Clark, Smith, Sasser, Woods, Herbert, Pickett, and by the Alabama Supreme Court, see, e.g., Turner, Christian. However, the majority shrinks from overruling these precedents and fails to distinguish them. In this case, as in those discussed above, there was no evidence placed before the jury to contradict any testimony of Janezic's insanity, much less the overwhelming expert testimony. Accordingly, the jury's rejection of that testimony was arbitrary and improper.
Today's decision exposes a haphazard application of the law. The constitutional ramifications of such an inconsistent application of a law were discussed in Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886), wherein the Supreme Court held, as follows:
"Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with ... an unequal hand, so as practically to make unjust, and illegal discrimination between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."
Id. at 373-74, 6 S.Ct. at 1073. Thus, the majority's review, being inconsistent with review of prior cases, may violate Janezic's constitutional right to due process of law.
Based on the foregoing, I believe the trial court's judgment should be reversed. As a final note, I reiterate that any shred of reliability in the jury's verdict finding Janezic to have been sane at the time she killed Rev. Simon was completely destroyed by Janezic's blatant incompetency to stand trial. See Cooper v. Oklahoma, 517 U.S. at 364, 116 S.Ct. at 1382 ("an erroneous determination of competence threatens a `fundamental component of our criminal justice system'the basis fairness of the trial itself") (footnote omitted). This issue of incompetency was ignored by the majority's affirmance of Janezic's conviction. However, this is an additional, equally compelling reason to reverse the trial court's judgment. Therefore, I must dissent.
NOTES
[1] Janezic had been associated with the Valley Fellowship Church since 1984 or 1985, but it does not appear that she was an active member.
[2] According to testimony, lithium is toxic at concentrations above 1.2 milliequivalents per liter of blood, and it has no therapeutic value at concentrations below 0.5 milliequivalents per liter of blood. The therapeutic range falls between these two values.
[3] Some testimony indicates that this event occurred on September 4, 1993. However, it appears that the testimony stating that the event occurred on September 3, 1993, is accurate.
[4] The shooting of Jimmy Thorne was not prosecuted as part of this proceeding.
[5] Maier distinguished schizophrenia from bipolar disorder, stating that the former is a thought disorder but the latter is a mood disorder. Both, he testified, are incurable.
[6] The following statement by the trial court at the November 14, 1994, hearing on Janezic's competency indicates that the trial court misapprehended this continuing and affirmative duty: "The issue of the defendant's competency to stand trial was presented to and thoroughly debated by one jury and decided and that decision will not be revisited."
[7] Although Charles Carter equivocated when asked whether he believed that Janezic was mentally stable, the substance of his testimony corroborates the testimony of Janezic's expert witnesses.
[8] Clearly, the chain of inferences set out in United States v. Myers is poorly equipped to divine, from evidence of flight, the ability of a severely mentally ill defendant to appreciate the wrongfulness of his or her conduct.
[9] United States v. Myers, 550 F.2d at 1049.
[10] The evidence is unrefuted that Janezic was floridly psychotic at the time she killed Simon. Moreover, as demonstrated, she already had a extremely long and well-documented history of being tormented by paranoid delusions.
[11] The majority appears to imply that the ability to plan a murder is probative of one's ability to appreciate the wrongfulness of her acts. I believe that this conclusion is contrary to the expert testimony at trial, contrary to human experience, and unsupported by the law. The mere existence of a plan is not probative of a murder defendant's sanity, as defined by § 13A-3-1. Indeed, as an offspring of the element of "intent," required to prove the offense of murder, the law deems all murders to be planned to some extent. Therefore, the majority's holding on this issue suggests the absurd conclusion that the commission of a murder is evidence of sanity.
[12] Even in those cases where the defendant testifies and is actually competent at trial (and I stress that neither of these factors was present in this trial), the value of demeanor evidence as proof of past sanity is limited.